L. S. AYRES & CO. ET AL. *v.* IPALCO ET AL.

[No. 871A159. Filed July 12, 1976. Rehearing denied February 7, 1977. Transfer denied May 11, 1977.]

654

*John J. Dillon, Virginia Dill McCarty,* of Indianapolis, *Paul Hirsch,* of Indianapolis, for appellants.

*John H. Groves, Alan W. Boyd, Jerry P. Belknap, Shirley A. Shideler* and *Jon D. Noland, Barnes, Hickam, Pantzer & Boyd,* of Indianapolis, *Leslie Duval,* of Indianapolis, *Carl C. Winter,* of Indianapolis, *Theodore L. Sendak,* Attorney General, *Ralph W. Husted* and *Marcus E. Woods,* Indianapolis Power & Light Company, *Carl E. Van Dorn,* Public Counselor, *Gary Landau,* City Attorney, *Paul F. Kortepeter,* of Indianapolis, for appellees.

STATON, P.J.—The Indianapolis Power & Light Company, a public utility, filed a petition with the Indiana Public Service

Commission to increase its electric rates. A new rate increase would affect 270,454 ratepayers in Boone, Hamilton, Hancock, Hendricks, Johnson, Marion, Morgan, Owen, Putnam, and Shelby Counties.[1] The old rates had been in effect since August 1, 1938. In its petition to increase electric rates, the Petitioner, Indianapolis Power & Light Company, stressed the narrowing margin over past years between its operating revenues and operating expenses. This narrowing margin had resulted in a denial of a fair return to the Petitioner upon the fair value of its utility properties. The new rates proposed by the Petitioner would increase operating revenues approximately $14,700,000.00 and would increase income approximately $6,800,000.00 per year.

Before the Commission held a formal hearing upon the petition, G.V. Ginger & Associates, Inc., L.S. Ayres & Company, et al., and the City of Indianapolis filed petitions to intervene which were granted by the Commission.

After the formal hearing on the petition, the Commission issued an order on July 30, 1971 which granted a rate increase designed to produce an annual operating revenue of $107,460,674.00 on the basis of allowable annual operating expenses of $78,670,994.00. This would result in an annual operating income of $28,789,680.00 to the Petitioner. Intervenor L.S. Ayres & Company is appealing from this order. Our jurisdiction to review the order is predicated upon IC 1971, 8-1-3-1 to -12 (Burns Code Ed.), which authorizes "[a]ny person, firm, association, corporation, city, town or public utility adversely affected by any final decision, ruling, or order . . ." of the Commission to seek judicial review. IC 1971, 8-1-3-1 (Burns Code Ed.).

Our reviewing opinion affirms the Commission's order in part and remands with instruction for further proceedings consistent with our opinion.

1. The petition stated that these 270,454 ratepayers were classified as follows: 240,963 residential; 28,013 small commercial and industrial; 1,401 large commercial and industrial; and 77 public lighting.

# I.
## Rate Method

To place the issues raised by this appeal in perspective, it is necessary to provide the reader with some background on the methodology of rate regulation. The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. IC 1971, 8-1-2-4 (Burns Code Ed.).; *Federal Power Comm'n* v. *Hope Natural Gas Co.* (1944), 320 U.S. 591, 605, 64 S.Ct. 281, 88 L.Ed. 333. Accordingly, the initial determination that the Commission must make concerns the future revenue requirement of the utility. This determination is made by the selection of a "test year"— normally the most recent annual period for which complete financial data are available—and the calculation of revenues, expenses and investment during the test year.[2] The test year concept assumes that the operating results during the test period are sufficiently representative of the time in which new rates will be in effect to provide a reliable testing vehicle for new rates.

The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the "return" that is available to be distributed to the utility's investors.[3] Allowable operating costs include all types of operating expenses (e.g., wages, salaries, fuel, maintenance) plus annual charges for depreciation and operating taxes. While the utility may incur any amount of operating expense it chooses, the Commission is invested with broad discretion to disallow for rate-making purposes any excessive or imprudent expenditures. IC 1971, 8-1-2-48 (Burns Code Ed.).

Test-year revenue and expense data, however, may not always provide a suitable basis for determining rates. Because of abnormal operating conditions such as unusual weather or

---

2.  J. Bonbright, Principles of Public Utility Rates 149-51 (1961).

3.  J. Bonbright, *supra* note 1, at 149; 1 A. Priest, Principles of Public Utility Regulation 45-46 (1969).

atypical equipment outages, test-year revenues and expenses or both may not faithfully reflect normal conditions. If test-year results are unrepresentative, appropriate adjustments must be made to correct for the effects.[4] This type of adjustment is commonly labeled an "in-period adjustment." Since test-year results are relevant for a determination of utility rates only to the extent that past operations are representative of probable future experience, further adjustments are usually necessary to account for changed conditions not reflected in test-year data. For example, if future operations will be required to bear higher tax rates or higher levels of wages and salaries than were incurred during the test year, test-year data must be adjusted to reflect increased costs. This type of adjustment to test-year data is usually referred to as an "out-of-period adjustment."

After the utility's existing level of earnings or "return" is established, the amount of investment in utility operations—the "rate base"—is determined by adding the net investment in physical properties to an allowance for working capital.[5] The "rate base" consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the "return" is to be earned. Since traditional rate-making methodology utilizes the "historical" test year, the "rate base" is usually defined as that utility property "used and useful" in rendering the particular utility service. IC 1971, 8-1-2-6 (Burns Code Ed.). The property included in the "rate base" may be valued by one of two standard methods: (1) the "original cost" method, which is based on book value (the cost of an asset when first devoted to public service), or (2) the "fair value" method, which takes into account the declining purchasing power of the dollar through "reproduction cost new" studies utilizing price indices or other measures of an invest-

---

4. See 1 A. Priest, *supra* note 2, at 47-51.
5. J. Bonbright, *supra* note 1, at 173-74.

ment's current value.[6] The Indiana statutory scheme authorizes the use of either valuation method. IC 1971, 8-1-2-6 (Burns Code Ed.).

After existing levels of "returns" and "rate base" are determined, the Commission must decide whether the "rate of return," the ratio of "return" to "rate base," is deficient, adequate, or excessive. The generally accepted method for establishing a comparative basis to determine the adequacy or excessiveness of the utility's existing "return" is the "cost of capital" approach. The Commission first examines the utility's capital structure to identify the sources of the utility's capital; the capital structure of an average electric utility might consist of 50 percent debt, 15 percent preferred stock and 35 percent common stock.[7] The Commission then ascertains the cost of each capital component: (1) the cost of debt, determined by comparing the utility's annual interest requirements with the proceeds from utility bond sales; (2) the cost of preferred stock, determined by comparing the stated dividend requirements on outstanding preferred stock with the proceeds from preferred stock sales; (3) the cost of common stock, determined by the return required to sell such stock in prevailing capital markets. After these preliminary determinations are made, the Commission calculates a composite "cost of capital" by taking a weighted average of the cost of each capital component. The composite cost of capital, when expressed as a percentage of the utility's combined debt and equity accounts, is then compared with the utility's existing rate of return, and thus serves as an initial point of reference in establishing a "fair rate of return" for utility operations. The United States Supreme Court has delineated the legal criteria for determining a "fair rate of return." In *Bluefield Waterworks & Improvement Co.* v. *Public Serv. Comm'n* (1923), 262 U.S. 679, 692-93, 43 S.Ct. 675, 679, 67 L.Ed. 1176, the Court stated:

---

6.   1 A. Priest, *supra* note 2, at 140, 156-66.

7.   J. Bonbright, *supra* note 1, at 243-44.

"What annual rate will constitute just compensation depends upon many circumstances and *must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts.* A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

The "fair rate of return" is usually the final subsidiary issue that the Commission resolves in determining the utility's revenue requirement. After considering all other issues, many regulatory agencies frequently employ the rate of return component as a "balance wheel" to provide a limited margin of error for the resolution of other issues. *See* Jones, *Judicial Determination of Utility Rates: A Critique,* 54 B.U.L. REV. 873, 875-83 (1964). The Commission's primary objective is to reach an overall result that is equitable and that will permit continuity of utility services on a sound financial basis. IC 1971, 8-1-2-4 (Burns Code Ed.) ; *Federal Power Comm'n* v. *Hope Natural Gas Co.* (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

While this brief summary may indicate that determining a utility's revenue requirement is a simple, almost mechanical task, the process actually requires extensive examination of the utility's operations and continuing exercises of informed administrative judgment.[8] Throughout the remainder of this

---

8. Professor Charles Phillips, an economist, has constructed a simple mathematical formula for the expression of a utility's total revenue requirement:

opinion, two crucial facts about the rate-making methodology should be observed. First, the determination of a utility's revenue requirement is primarily an exercise in informed regulatory judgment. Second, if that judgment is to be exercised properly, the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years.

## II.

### Standard of Review

The appropriate standard of judicial review for the Commission's factual determinations is prescribed by statute. IC 1971, 8-1-3-1 (Burns Code Ed.) provides a two-tier standard of review:

"An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the findings of facts upon which it was rendered."

At the first level of review, the statutory standard requires that the Commission's decision contain specific findings on all the factual determinations material to its ultimate conclusions. *General Tel. Co.* v. *Public Serv. Comm'n* (1958), 238 Ind. 646, 150 N.E.2d 891; *Fred J. Stewart Trucking, Inc.* v. *Bunn Trucking Co.* (1972), 151 Ind. App. 157, 278 N.E.2d 310; *Daviess-Martin County Rural Tel. Corp.* v. *Public Serv. Comm'n* (1961), 132 Ind. App. 610, 174 N.E.2d 63. The requirement that an administrative agency il-

---

"$R = O + (V\text{-}D)r$

where
R is the total revenue required,
O is the operating costs,
V is the gross value of the tangible and intangible property,
D is the accrued depreciation of the tangible and reproducible property, and
r is the rate of return."

C. Phillips, The Economics of Regulation 131 (1965).

luminate its decision-making process with specific findings of the basic facts upon which its decision is based has been extensively discussed in recent opinions of this Court. *See, e.g., Bendix Corp.* v. *Radecki* (1973), 158 Ind. App. 370, 302 N.E. 2d 847. The policies underlying the "basic findings" requirement apply with special force to Commission rate orders. The legislative scheme which delegates to the Commission its rate-making authority merely requires that the rates and charges established be "reasonable and just." IC 1971, 8-1-2-4 (Burns Code Ed.). Since the Commission operates without the benefit of legislative guidance, it must attempt to formulate general standards of rate-making policy on an *ad hoc* case-by-case basis. Moreover, the rate-making function involves innumerable technical determinations which are peculiarly within the Commission's competence and expertise. When the Commission provides the reviewing court with basic findings of fact on all issues material to its decision, its expert reasoning process and subtle policy judgments provide an intelligible framework for the judicial non-expert. Since "basic findings" afford a rational and informed basis for review, the danger of judicial substitution of judgment on complex evidentiary issues and policy determinations is substantially reduced. *See Hancock Rural Tel. Corp.* v. *Public Serv. Comm'n* (1964), 137 Ind. App. 14, 201 N.E.2d 573. The process of formulating basic findings on all material issues can also serve to aid the Commission in avoiding arbitrary or ill-considered action. "Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper." 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 16.05, at 477 (1958), quoting Judge Frank in *United States* v. *Forness* (2d Cir. 1942), 125 F.2d 928, 942. There is little assurance that an administrative agency has made a reasoned analysis if it need state only ultimate findings or conclusions.

The second level of factual review prescribed by IC 1971, 8-1-3-1 (Burns Code Ed.) requires a reviewing court to inquire

whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Boone County Rural Elec. Membership Corp.* v. *Public Serv. Comm'n* (1959), 239 Ind. 525, 159 N.E. 2d 121; *City of Terre Haute* v. *Terre Haute Water Works Corp.* (1962), 133 Ind. App. 232, 180 N.E.2d 100. While IC 8-1-3-1 contains no specific reference to the "substantial evidence" test, the statute has been consistently interpreted to authorize reviewing courts to set aside Commission findings of fact which are unsupported, on the whole record, by substantial evidence. *See, e.g., Pennsylvania R.R. Co.* v. *Town Board of Trustees* (1966), 139 Ind. App. 216, 218 N.E.2d 171; *Knox County Rural Elec. Membership Corp.* v. *Public Serv. Co.* (1966), 139 Ind. App. 547, 213 N.E.2d 714. Moreover, the Indiana Supreme Court has clearly indicated that the "substantial evidence" test encompassed by the statute is not a hybrid standard formulated specifically for review of Public Service Commission decisions, but it is a standard from federal and state common law principles governing judicial review of administrative action. In *Public Serv. Comm'n* v. *City of Indianapolis* (1956), 235 Ind. 70, 80-81, 131 N.E.2d 308, 312, Justice Arterburn explained the derivation of Indiana's "substantial evidence" standard of judicial review:

> "This rule regarding 'substantial evidence' is one adopted by the Supreme Court of the United States in Florida v. United States (1934), 292 U.S. 1, 12, 54 Sup. Ct. 603, 608, 78 L.Ed. 1077, where the court said:
>
> > '. . . its (commission's) findings of fact are supported by substantial evidence are not subject to review. It is not the province of the court to substitute their judgment for that of the commission.' "

Judicial attempts to define the meaning of substantial evidence have met with less than unqualified success. A principal guide to the content of this elusive concept has been a statement by Chief Justice Hughes:

> "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Consolidated Edison Co.* v. *NLRB* (1938), 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.
Another statement of the United States Supreme Court provides some additional clarification: Substantial evidence "means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. . . ." *NLRB* v. *Columbian Enameling & Stamping Co.* (1939), 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660. Professor Davis has perhaps provided the best analysis:

> "The meaning of 'substantial evidence' is about as clear and about as vague as it should be; the main inquiry is whether on the record the agency could reasonably make the finding. . . . Despite the theory, the judges as a matter of practical fact have a good deal of elbow room to vary the intensity of review as they deem necessary or desirable in particular cases." 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 29.01, at 118 (1958).

From a review of these authorities, we conclude that the substantial evidence standard authorizes a reviewing court to set aside Commission findings of fact when a review of the whole record clearly indicates that the agency's decision lacks a reasonably sound basis of evidentiary support. *See Universal Camera Corp.* v. *NLRB* (1951), 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456.

Some additional clarification of our standard of review formula is necessary. It is well established that the substantial evidence test cannot be utilized to assay the "reasonableness" of the conclusions of ultimate fact inferred by an agency from its findings of basic fact. *See, e.g., NLRB* v. *Babcock & Wilcox Co.* (1956), 351 U.S. 105, 112, 76 S. Ct. 679, 100 L.Ed. 975; *NLRB* v. *Truitt Mfg. Co.* (1956), 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. Ultimate facts may be described generally as factual conclusions derived from the basic facts; they are often expressed in terms of statutory criteria such as "fair value" or "used and useful." Since findings of ultimate fact represent inferences drawn by the agency, they are not susceptible to scrutiny for evidentiary

support in the record; but the reasonableness of the agency's inference is a question appropriate for judicial determination —a "question of law."

It is equally well settled that in determining the "substantiality" of the evidence, the reviewing court must consider the evidence in opposition to the challenged finding of basic fact as well as the evidence which tends to support the finding. As Justice Frankfurter said: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp.* v. *NLRB* (1951), 340 U.S. 474, 488, 715 S.Ct. 456, 464, 95 L.Ed. 456.

### III.

### Prehearing Conference

Ayres filed a motion to intervene and a motion for a prehearing conference on January 4, 1971, two days before the scheduled hearing on the petition for a rate increase.[9] The motion to intervene was granted, but the motion for a prehearing conference was denied. Ayres contends that the denial of its motion for a prehearing conference was arbitrary, capricious and illegal and deprived it of due process of law.

Legal notice of the prehearing conference to be held on October 21, 1970 was issued on September 4, 1970. The prehearing order was issued by the Commission on October 29, 1970. Ayres' motion for a prehearing conference did not object specifically to any of the provisions of the prehearing order. The only stipulation in the order was the cost of capital stipulation, and Ayres entered into a similar stipulation later.

---

9. Rule IX(b) of the Public Service Commission's Rules and Regulations, effective November 30, 1964, provides:
 "(b) Intervening petitions shall be filed not less than three days prior to the initial date set for hearing and may be filed thereafter only with the consent of the presiding commissioner or examiner."
 This Rule was changed effective October 11, 1972:
 "(b) Intervening petitions shall be filed not less than five [5] days prior to the date set for the initial public hearing and may be filed thereafter only with the consent of the commission, presiding commissioner, deputy commissioner or examiner."
 Ind. Admin. Rules & Regs. (54-401)-9(b) (Burns Supp. 1975) and (Burns 1967).

The only remote prejudice to Ayres would have been in the test year determination of the prehearing order. We will discuss the test year later in this opinion and will remand its determination to Commission. This remand should eliminate any possible prejudice to Ayres.

Rule XXII(c), Ind. Admin. Rules & Reg. (54-401)-22(c) (Burns 1967), provides that Indiana statutes and rules of the Indiana Supreme Court governing civil practice and procedure shall apply in all cases not specifically provided for by the Commission's rules of practice and procedure.[10] The granting or denial of a motion for a second prehearing conference two days before the hearing is within the discretion of the Commission. The general rule applicable here in the absence of a Commission rule is that an intervenor must accept the procedural posture of the hearing at the time of intervention.[11] *In re Woerner* v. *City of Indianapolis* (1961), 242 Ind. 253, 177 N.E.2d 34, *cert. denied,* 368 U.S. 989, 82 S.Ct. 605, 7 L.Ed.2d 526 (1962) ; *Gerdenich* v. *Goss* (1945), 115 Ind. App. 538, 60 N.E.2d 603; *Abeele* v. *Ruse* (1942), 112 Ind. App. 596, 44 N.E.2d 235.

The prehearing conference had been concluded when Ayres intervened. Ayres has no absolute procedural right to have a second prehearing conference. If each intervening party could demand a separate prehearing conference, a hearing might be delayed for an unreasonable length of time and the purpose of

---

10. Rule XXII(c) of the Public Service Commission's Rules and Regulations effective November 30, 1964, now Rule XXII(b) effective October 11, 1972, provides:

". . . Indiana Statutes and rules of the Indiana Supreme Court governing civil practice and procedure shall apply in all cases not specifically provided for by these rules of practice and procedure." Ind. Admin. Rules & Regs. (54-401)-22(b) (Burns Supp. 1975).

11. Rule IX(d) of the Public Service Commission's Rules and Regulations concerning practice and procedure effective October 11, 1972, Ind. Admin. Rules & Regs. (54-401)-9(d) (Burns Supp. 1975), now provides:

"An intervenor shall be bound by all stipulations, rulings and other matters of record prior to the time such intervenor is made a party and shall take the case as he finds it as of the date of intervention."

the hearing completely frustrated. The right to intervene does not include the right to delay. Indiana Rules of Procedure, Trial Rule 24(B)(2) reflects the concern of delay when intervention has been granted:

"In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

We conclude that the Commission did not abuse its discretion when it overruled Ayres' motion for a second prehearing conference two days before the scheduled hearing on the merits of the petition.

## IV.

### Jurisdictional Notice

The Commission published the jurisdictional notice required by statute for the January 6, 1971 hearing.[12] This

---

12. "Notwithstanding the provisions of any other law of the state of Indiana relative to the publication of notice of hearings to be held by the public service commission of Indiana, publication of notice of hearings to be held by the public service commission of Indiana shall be made only in accordance with the provisions of this act [8-1-1-1—8-1-1-13]. Whenever the public service commission of Indiana shall order a hearing in any proceeding instituted by or against any public utility or railroad, except a motor vehicle carrier, notice of such hearing shall be given by one [1] publication appearing not less than ten [10] days prior to the date fixed for said hearing in two [2] newspapers of general circulation published in one [1] county wherein reside patrons or customers of said public utility or railroad who might be affected by an order made by the commission pursuant to said hearing. If two [2] newspapers of general circulation are not published in any such county, then one [1] publication appearing not less than ten [10] days prior to the date fixed for said hearing in one [1] newspaper of general circulation published in such county shall be sufficient. If no newspaper of general circulation is published in any such county, then the public service commission of Indiana shall cause notice of such hearing to be given by one [1] publication appearing not less than ten [10] days prior to the date fixed for said hearing in two [2] newspapers of general circulation published in a county adjoining any county wherein reside patrons or customers of said public utility or railroad who might be affected by such order. Whenever the public service commission of Indiana shall order a hearing in any proceeding instituted by or against a motor vehicle carrier, notice of such hearing shall be given by one [1] publication appearing not less than ten [10] days prior to the date fixed for such hearing in two [2] newspapers of general circulation published in the county where such motor vehicle carrier has its principal office or place of business. If two [2] newspapers of general

hearing was convened on January 6th and later recessed from day to day until January 8, 1971 when intervenor G.V. Ginger and Associates, Inc. moved for a continuance, since its legal counsel was a member of the Indiana General Assembly.[13] Cross examination of Petitioner's witnesses by Ayres and the public counselor, as well as any redirect examination by the Petitioner, remained to complete the Petitioner's case for a rate increase. The Commission granted the motion for continuance and continued the rate increase hearing until January 28, 1971. Later, on January 22, 1971, another intervenor requested a continuance. There being no objections, the Commission continued the hearing until June 7, 1971.[14]

Ayres contends that the Commission is without jurisdiction, since it did not publish a second statutory notice for June 7, 1971.

In support of its argument, Ayres cites 24 I.L.E. *Public Service Commission* § 42, and *City of New Haven* v. *Indiana*

circulation are not pubilshed in such county, then one [1] publication appearing not less than ten [10] days prior to the date fixed for such hearing in one [1] newspaper of general circulation published in such county shall be sufficient. If no newspaper of general circulation is published in said county, then the public service commission of Indiana shall cause notice of such hearing to be given by one [1] publication appearing not less than ten [10] days prior to the date fixed for such hearing in two [2] newspapers of general circulation published in a county adjoining the county where such motor vehicle carrier has its principal office or place of business. If said motor vehicle carrier has no office or place of business in the state of Indiana, then such notice shall be given by one [1] publication appearing not less than ten [10] days prior to the date fixed for said hearing in two [2] newspapers of general circulation published in Marion County. In addition to such published notice, said commission shall mail notice of such hearing, also notice of the filing with it of applications or proceedings to such persons, firms or corporations having competitive interests involved and to the representatives of any city or town affected by such hearing, application or proceeding; Provided, That failure to mail such notices shall not be deemed to be jurisdictional, but may be ground for rehearing." IC 1971, 8-1-1-8 (Burns Code Ed.).

13. Legal counsel for G.V. Ginger and Associates, Inc. was Senator Leslie Duval. The Indiana General Assembly convenes for its annual session in January.

14. Again on January 28, 1971, the date of the first granted continuance, the Commission convened to make a record of the second granted continuance which continued the hearing to June 7, 1971.

*Suburban Sewers, Inc.* (1970), Ind. App., 261 N.E.2d 240.[15] Neither of these authorities support Ayres' contention when applied to the above facts. It is only where a continuance is granted before the hearing is convened on the date of the original published notice that a second statutory notice is necessary to establish jurisdiction.

Once the hearing is convened upon the date and the time given in the published statutory notice, jurisdiction attaches. Any later continuance of the rate hearing does not affect the Commission's jurisdiction. IC 1971, 8-1-1-8 (Burns Code Ed.).

We conclude that the Commission had jurisdiction to issue its rate order.

## V.

### Prefiled Testimony

The prefiling of written testimony and the prefiling of exhibits is a common practice in hearings before the Indiana Public Service Commission. Prefiled testimony and exhibits do not preclude or restrict the presentation of live testimony. The purpose of the prefiling practice is to save hearing time and to assure accuracy. Hearings before the Commission necessarily require considerable expert testimony and complex accounting exhibits.

Ayres' prefiled testimony and exhibits were due on January

15. This opinion was vacated by the Indiana Supreme Court. *City of New Haven* v. *Indiana Suburban Sewers, Inc.* (1972), 257 Ind. 609, 612-13, 277 N.E.2d 361, 362-63. Justice Prentice writing for the Supreme Court stated:

"Such jurisdiction was established when notice of the time and place of public hearing was given more than ten (10) days prior to the date set for the hearing, as prescribed by the Statute, Indiana Acts 1957, ch. 313, § 2, 1969 Supp., Burns Ind. Stat. Ann., § 54-601c [IC 1971, 8-1-2-89]. Having been thusly established, such jurisdiction continued throughout the proceeding including the rehearing, and we believe that the ends of justice would not be served by faulting proceedings by reason of a defect in the form of notice, if such defect did in fact exist, when the complaining party attended and participated therein. Clearly the notice which Appellant insists should have been given would not have benefited it, and its omission did it no harm."

22, 1971.[16] It filed a "Motion for Enlargement of Time" on the due date which was as follows:[17]

"1. That all dates heretofore set for the filing of testimony and exhibits be enlarged to a uniform date in view of the request of the Public Counselor and certain other Intervenors;

2. That a more orderly procedure will be had before the Commission if all filing dates follow a logical sequence and all parties, including the petitioner, are permitted to examine and cross-examine in a logical sequence.

WHEREFORE, these Intervenors ask that prefiling dates be enlarged to provide for a logical and orderly sequence in the trial of this matter."

On the same day, January 22, 1971, the Commission entered a new order as to prefiling. This order provided that the Public Counselor and intervenors should have until May 17, 1971 to prefile testimony and exhibits. Cross-examination of Petitioner's witnesses and presentation of Ayres' evidence was scheduled for June 7, 1971. No objection was made by Ayres to this new order.

Ayres contends that Rule XVII(c), Ind. Admin. Rules & Regs. (54-401)-17(c)[18] entitles it to file prefiled testimony and exhibits after cross-examination of Petitioner's witnesses. The Rule provides that "The petitioner shall open and close." Ayres further contends that the Commission abused its dis-

---

16. The prehearing order provided that the Petitioner file its prefiled testimony and exhibits by November 30, 1970 and that the intervenors file their prefiled testimony and exhibits by January 22, 1971.

17. On January 6, 1971, the Public Counselor made a motion in which Ayres joined "for the obvious reason that something might be produced on cross-examination which might have to be met by our exhibits, . . ." This motion by the Public Counselor related to the changing of the date for prefiled material set forth in the prehearing order. The hearing examiner overruled the motion on January 6, 1971. This ruling was appealed to the full Commission by the Public. The full Commission affirmed the examiner's ruling January 8, 1971. Later, January 22, 1971, the Commission issued an order changing the required prefiling date of January 22, 1971.

The above explanation is made to clear up what appears to be some confusion in Ayres' Brief. The above is a reflection of the record.

18. Rule XVII(c) "The petitioner shall open and close." is now Rule XVII(d) Ind. Admin. Rules & Regs. (54-401)-17(d).

cretion when it set prefiling dates which preceded cross-examination of Petitioner's witnesses.

Ayres does not attempt to show how it was prejudiced by the setting of the prefiling dates prior to cross-examination.[19] Its failure to object to the Commission's new order which revised prefiling dates amounts to a waiver of any error on the part of the Commission. However, Rule XVII(c) is not applicable to these facts. Under Rule XXII(c), *supra,* the Indiana Supreme Court Rules would control the question of discretion raised by Ayres. Indiana Rules of Procedure, Trial Rule 43(G) provides that the order of presenting evidence is within the discretion of the Commission. Also see *Powell* v. *Powell* (1974), 160 Ind. App. 132, 310 N.E.2d 898; *Malo* v. *Bowlers Country Club, Inc.* (1972), 152 Ind. App. 413, 283 N.E.2d 806. Ayres has not demonstrated any prejudice or abuse of discretion. We find none.

## VI.

### Test Year Revenues

The Commission adopted a historical test year in its prehearing order and a going-level accounting method with adjustments limited to those which are ". . . known, fixed and measurable within twelve months of June 30, 1970. . . ." Its prehearing order provided in part:

"3.  The Test Year for evidence to be presented to determine Petitioner's actual and adjusted operating revenues, expenses, profit or loss under its present rates and for determining the effect thereon of its proposed rates will be the twelve months ending June 30, 1970.

"4.  The accounting method to be folowed with respect to all accounting and financial exhibits will be on the "going-level" basis further limited to adjustments that are known, fixed and measurable within twelve months of June 30, 1970 except that real and property tax calculations may include two pro forma years for expense determination."

19. Ayres prefiled the testimony of Seymour Schwartz. All other testimony presented by Ayres was live testimony.

As an adjustment to the rate base, Petitioner's Petersburg Plant Number Two was added. This plant had been used to produce non-jurisdictional energy under a contract with the Indiana & Michigan Electric Company which had been approved by the Federal Power Commission. This contract for 200,000 megawatts of electric energy had a termination date of April 30, 1971 which was known within the test year. The revenue received by the Petitioner under the contract, $2,843,-529.00, was excluded, but most of the expenses were included in the rate base. This contract sale represented approximately forty-five percent of the Plant's 450,000 megawatt capacity. During the test year, the Petitioner had been required to purchase $1,324,096.00 worth of electrical energy to satisfy the demand of its ratepayers. The Commission included the entire $25,000,000 Plant in the rate base. An undefined increase in demand by Petitioner's ratepayers for electrical energy was the only reason given for including the entire plant.

Ayres contends that to avoid a distorted and disproportional rate increase, future revenues to be earned by the Plant should have been estimated and included since substantially all Plant expenses were included.[20] It contends that the Commission

---

20. In addition to challenging the historical test year used by the Commission, Ayres challenged as error the inclusion of the Plant on the grounds of its availability for the convenience of the public and the exclusion of testimony regarding the number of revenue producing ratepayers on May 1, 1971.

There was substantial evidence that it was known within the test year that Indiana & Michigan Electric Company contract would terminate on April 30, 1971 and that the Plant would be available. The Federal Power Commission has jurisdiction over the interstate sales of energy but not the plant facilities. Therefore, once any contractual sales have terminated, the availability of the plant for jurisdictional rate base use is apparent. Ayres' availability argument is without merit. However, the establishment of availability does not automatically establish the Plant as used and useful or reasonably necessary for rate-making purposes. These requirements, used and useful and reasonably necessary, will be discussed later in our opinion.

The hearing was continued to June 22, 1971 by the Commission's order entered October 29, 1970. Ayres contends that it was error for the Commission to exclude testimony which would now show more accurately the exact number of ratepayers to be served by the Plant and the amount of revenue which would be produced as of May 1, 1971. The testimony would establish a going level adjustment outside

committed error by adopting a historical test year guideline instead of a future test-year guideline, since little meaningful historical data is available. It contends that the piecemeal adjustments made before the inclusion of the Plant into the rate base are meaningless.[21] Therefore, use of the historical test-year guideline will not produce the necessary "reasonable and just" rates sought by the Commission.

The theory underlying the use of *any* test-year and adjustment method in the rate-making process demands that the data used provide an accurate picture of the utility's operations during the period in which the proposed rates will be in effect. The test year may be analogized to the technique of stopping a film to examine one isolated frame. By freezing the action of the utility's operations in a convenient time frame, the Commission can observe the inherent interrelationships among rate base, expenses and revenues. This observation is crucial to the concept of the test period because a complete picture of these dynamic interrelationships can only be obtained when the rate base, expense and revenue components are examined in phase. Thus, rate base, expense and revenue data for an historical test year are meaningful for a determination of utility rates only insofar as past operations are representative of probable future experience. Significant changes in a utility's operating structure, such as rapid plant expansion, may render even the most current historical data inadequate as a basis for predicting the results of future operations.

the test year which was not known within the test year. If the Commission would have allowed the admission of this testimony, it would have violated its own prehearing order and destroyed the purpose of establishing a test year. The Commission did not commit error by excluding this testimony.

21. A number of adjustments were made before the Petersburg Plant Number Two was made a part of the rate base. These adjustments included 2000 more ratepayers than the average number of ratepayers during the test year which would be an increase to revenue. Wholesale electric power purchased during the test year at $1,324,096.00 was deducted as an expense. Other expenses were reduced totaling $7,732,842.00 as shown by Petitioner's Exhibit 7, Schedules 4 and 5.

Even the ameliorative technique of adjusting test-year figures to reflect changes that have occurred or will occur subsequent to an historical test period may be inadequate when the test-period data are themselves fundamentally unrepresentative. These adjustments, being by definition piecemeal, often accomplish little in meeting the overell effects of rapid expansion or significant shifts in consumer demand. The sheer complexity of the adjustment process can affect the reliability of the results achieved; an adjustment to rate base for new plant will invariably necessitate further complicated adjustments to revenue and expense data. This factor alone has discouraged many regulators from authorizing any adjustments at all. When requested to make an adjustment in a utility's test-year revenues to reflect the loss of a large industrial customer, the Colorado Public Utilities Commission stated:

> "Normally, the test year is adjusted to take care of known changes within said test year to reflect these changes for the entire period of the test year. When something occurs after the test year, it is unfair to the company or the customer, if a single or a few particular items are adjusted without making adjustments for all changes that have occurred subsequent to the test year. In other words, if an adjustment is to be made out of period, perhaps the fairest method to follow is, in effect, to move the date of the test year to a new period of time and again make all adjustments for known changes in the new period." *In re Southern Union Gas Co.* (1963 Colo. Pub. Util. Comm'n) 50 P.U.R.3d 350, 360.

Other regulatory commissions have rejected methods which adjust only for selected changes on the ground that such adjustments destroy the usefulness of the test year as a vehicle for simultaneous observation of the interrelationships between rate base, expenses and revenues. *See, e.g., In re Rochester Gas & Elec. Corp.* (1971 N.Y. Pub. Serv. Comm'n), 88 P.U.R. 3d 271; *In re New Haven Water Co.* (1970 Conn. Pub. Util. Comm'n), 84 P.U.R.3d 428.

While under some circumstances historical data may provide a distorted approximation of a utility's operations, the re-

liability of the projected or future test year method advocated by Ayres has been widely disputed. Some regulatory commissions have accepted projected data and future estimates in determining the propriety of proposed rates. *See, e.g., In re Powell Telephone Co.* (1970 Tenn. Pub. Serv. Comm'n), 85 P.U.R.3d 124; *In re Elizabethtown Water Co.* (1969 N.J. Bd. of Pub. Util. Comm'rs), 77 P.U.R.3d 515; *In re Jacksonville Gas Corp.* (1961 Fla. R.R. & Pub. Util Comm'n), 37 P.U.R.3d 433. But even those commissions utilizing the future test year have expressed concern about the reliability of projected data, and many have limited its use to cases in which unusual circumstances rendered existing historical data clearly inadequate. *See, e.g., In re Mountain States Tel. & Tel. Co.* (1969 Utah Pub. Serv. Comm'n), 78 P.U.R.3d 429; *In re Michigan Gas & Elec. Co.* (1958 Mich. Pub. Serv. Comm'n), 24 P.U.R. 3d 278. The future test year has been most frequently used in rate proceedings involving utilities which have undergone rapid capital expansion or had experienced some substantial shift in operating structure. *See, e.g., In re Rochester Gas & Elec. Corp.* (1971 N.Y. Pub. Serv. Comm'n), 88 P.U.R.3d 271 (50 percent increase in rate base); *In re Jacksonville Gas Corp.,* (1961 Fla. R.R. & Pub. Util. Comm'n), 37 P.U.R.3d 433 (conversion from manufactured gas to natural gas). On the other hand, some regulatory agencies have decided that the data forecasts of the future test-year method are so inherently unreliable that they should never be considered in rate proceedings. *See, e.g., In re Southern Connecticut Gas Co.* (1969 Conn. Pub. Util. Comm'n), 81 P.U.R.3d 289; *In re Pennichuck Water Works* (1969 N.H. Pub. Util. Comm'n), 77 P.U.R.3d 347.

In the final analysis, the selection of a test year and the adoption of an adjustment method are complex issues of regulatory policy which must be resolved in light of the special facts of each case. The statutory scheme reflects the basic legislative policy that these questions of rate-making methodology are best consigned to the Com-

mission's expert judgment. IC 1971, 8-1-2-47 (Burns Code Ed.). The appropriate standard of review therefore limits our inquiry to whether, on the facts of this case, the test-year and adjustment method selected by the Commission were reasonably related to the purpose they were intended to serve —the fixing of "reasonable and just" rates. *Public Serv. Comm'n* v. *City of Indianapolis* (1956), 235 Ind. 70, 131 N.E. 2d 308; *Public Serv. Comm'n* v. *Indiana Bell Tel. Co.* (1956), 235 Ind. 1, 130 N.E.2d 467. This standard of review does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision. Our function of review is limited to a determination that the actual choice made by the Commission was based on a consideration of the relevant factors and was reasonably related to the discharge of its statutory duty. In other words, we must determine that there has been no clear error in judgment, and that the Commission's action is founded upon a reasonable basis of support in the whole record.

We have previously discussed the requirement that an administrative agency illuminate its decision-making process with specific findings upon all material issues. The legal concepts of "questions of fact," "questions of law," and "materiality" cannot, however, furnish adequate guidance in the review of Commission rate decisions. The Commission's policy determinations (legal decisions) are made on a case-by-case basis, and, of necessity, are inextricably intertwined with evidentiary conclusions (factual decisions). The subject matter of the regulatory process is too complex to permit the judicial non-expert any clear insight concerning the legal and factual issues which the Commission thought "material" to its decision. In light of these difficulties inherent in judicial review of rate proceedings, we are compelled to require the Commission to articulate the policy and evidentiary factors underlying its resolution of all issues which are put in dispute by the parties.

The Commission's treatment of the test-year issue amply illustrates the necessity of some minimal explanation of its decision. The prehearing conference order did not contain any statement of the policy considerations or evidence which motivated the Commission's selection of the test-year and adjustment method challenged by Ayres. Neither during the formal hearings nor in the Commission's final written order was any attempt made to articulate the reasons underlying the rejection of the future test-year method advanced by Ayres. Since the record is clearly insufficient to disclose the factors considered, we are incapable of determining that the considerations which *actually motivated* the Commission's decision were reasonably related to the discharge of its statutory duty. We must remand this portion of the proceedings to the Commission for a clear statement of the policy and evidentiary considerations underlying its test-year and adjustment method determinations.

## VII.

### Interconnecting Plant Used in Pooling Arrangements

Pooling arrangements are entered into by neighboring utilities to avoid the wastefulness associated with small increases in their plant and to meet added energy demands.[22]

---

22. " 'Co-ordination is a vehicle by which groups of electrical systems through common action can obtain the benefits of economy of size in the planning and development of sources of power supply and transmission. There are two essential prerequisites for full co-ordination: One is the construction of adequate transmission line interties and associated equipment to permit an uninterrupted and economical flow of electric energy throughout the electric network. The second is intersystem planning and the formulation of agreements between the interconnected systems to take full advantage of all of the economic opportunities for the construction and operation of facilities that will result in the lowest overall cost of power, with equitable sharing of the costs and benefits.

" 'Co-ordinated intersystem planning of capacity requirements to supply diversified regional loads will enable the utilities to meet the same demand for electricity with a significant savings in generating capacity. The savings result from taking advantage of diversities in the loads of the participating systems and from reduced requirements for reserves. Capacity can be shared among the co-ordinating utilities to meet the coincident peak demand of the regional load, thus taking advantage of load diversity between systems and providing savings. . . . Also, inter-

These demands are varied, but they usually include: additional ratepayers, peak periods of demand expected and unexpected, emergencies arising from weather, maintenance or other causes, regular maintenance shutdowns, and reserve for reliability of service. Pooling arrangements are made between neighboring utilities who have an excessive capacity of energy and those who have a shortage of energy. Each arrangement is filed with the Public Service Commission and the Federal Power Commission. Since these arrangements for the exchange of energy often involve interstate transmissions or sales of energy, the arrangements must be approved by the Federal Power Commission.

Unlike contract sales to a separate or specific customer for a definite amount of energy over a definite period of time, pooling arrangements are on a buy and sell as needed basis for the benefit of the utility's ratepayers. Unlike contract sales to a specific customer, no profit is realized. The amount received from the sale of energy to a member of the pool is credited against production expense in accordance with the applicable Uniform Classification of Accounts. Similarly, a purchase of energy is charged to production cost as "Coordination Energy Purchased."

What is actually accomplished by pooling arrangements is a lower unit cost for the energy produced for the utility's

system planning makes possible reductions in total generating reserve requirements in several ways. Smaller reserves are needed for unscheduled generator or transmission outages. Reserves for scheduled maintenance can also be reduced through co-ordinated maintenance schedules, with larger pools of capacity thus available to meet unscheduled outages or to serve other purposes. Moreover, standby reserves for meeting unpredicted growth in loads may be smaller. . . .

" 'Regional and interregional co-ordination also makes it possible to utilize larger and more economical generating units which are operated at higher load factors and produce electricity at the lowest possible cost per kilowatt-hour. Once the systems in a broad area are intertied with a large capacity transmission system there are further benefits in selecting the optimum plan types and locations, cheapest fuel sources and lowest fuel transportation costs, and most economical plant design and construction.' " *In re Public Serv. Elec. & Gas Co.*, (1967 N.J. Bd. of Pub. Util. Comm'rs), 69 P.U.R.3d 1, 15-16, *quoting from* Udall, 77 Public Utilities Fortnightly 52 (June 9, 1966).

ratepayers. The utility with an excess capacity can sell off that excess to a pool member who is then allowed to postpone needed construction until larger, economical construction is possible. These arrangements are made to serve and benefit the ratepayer of the utility pool member.

A part of the interconnecting plant used to transmit and receive energy under the Petitioner's pooling arrangement was included in the rate base as used and useful plant. Ayres contends that this was error, since the interconnecting plant was used in interstate sales under the jurisdiction of the Federal Power Commission. It further contends that there is not substantial evidence for the Commission's Finding Number Three which is as follows:

"3. *Petitioner's Electric Properties.* Petitioner's Electric Properties in service and used and useful for the convenience of the public as of June 30, 1970 included five steam powered electric generating plants known as its E.W. Stout Plant, its H.T. Pritchard Plant, its Petersburg Plant and its Perry K and Perry W Plants, all classified as Production Plant, with a total gross name plate rating generating capacity of 1,424,750 KW, a winter capability of 1,553,-000 KW, and a summer capability of 1,509,000 KW. Transmission Plant included 18 transmission substations; approximately 181 circuit miles of 345 KV lines, and approximately 252 circuit miles of 138 KV lines and 326 circuit miles of 34.5 KV lines, and related facilities. Distribution Plant included 135 distribution substations; approximately 4,418 pole miles of 13.2 KV, and lower, overhead lines; 864 cable miles of underground lines, and 486 miles of street lighting cable, and related facilities. In addition, Petitioner owned and operated General Plant facilities devoted to its electric utility service, and had incurred organization costs classified as Intangible Plant in accordance with the Uniform System of Accounts prescribed by the Commission for Class A and B Electric Utilities in Indiana which are properly includable as a part of its Utility Plant in Service.

"The evidence shows that the physical electric utility plant of Petitioner in service at June 30, 1970 was in good operating condition, was well maintained and efficiently operated, and that Petitioner was using the latest and most modern methods known to the science of electric generation, transmission and distribution consistent with economic con-

siderations associated therewith in Petitioner's service area, as a result of which Petitioner has been able to provide adequate, dependable, continuous, efficient and economic electric service to its customers and the public dependent upon it for such service. This is demonstrated by the fact that Petitioner's customers have never been subjected to brown-outs of black-outs, it has never been necessary for Petitioner to refuse electric service because of a lack of adequate facilities or ability to serve on its part, and it has never had to shed any part of its connected load, temporarily or otherwise, under normal operating conditions.

"The evidence shows further that the Electric Properties of Petitioner comprise a fully integrated system capable of independent operation, and that under usual and ordinary operating conditions Petitioner constructs and installs capacity on its system for its own service area and for its own customers who purchase electric energy from it on a continuing basis. However, in order to maximize the reliability of service to all its customers at all times under all conditions, Petitioner maintains arrangements with other neighboring electric utility companies in Indiana for the interconnection of its system with the systems of those companies to provide for emergencies and the exchange of reserve power. Among other things, these power pooling and interconnection arrangements permit a unified approach in planning the installation or purchase of generating capacity and the installation of interconnected transmission and substation facilities, and provide for the interchange of electric energy among the participating companies to supply capacity and energy deficiencies on their systems and to assure that normal generating reserves of the several participating companies are advantageously utilized. These arrangements enable each participating company to provide larger and more economical power production and transmission facilities than would be possible if each were to elect to go it alone. The resulting advantages are lower unit costs for the larger facilities than for smaller facilities of the same type, and lower operating expenses associated therewith, since fuel, labor costs and depreciation charges would be higher for the operation of more units of smaller size installed at higher unit costs and with lower operating efficiency than for that of larger facilities.

"The coordination arrangements referred to above do not impose any burden on the customers of Petitioner but, on the other hand, provide numerous and substantial benefits to such customers from the standpoint of both economies and reliability of service."

We have examined the record and find that there is substantial evidence to support the Commission's Finding Number Three. Petitioner's witness Fitzwater explained the use and purpose of the interconnection plant and its benefit to the Petitioner's ratepayers. He testified that without the pooling arrangement operating expenses and service rates would be higher. Vander Veen, another of Petitioner's witnesses, testified that he had excluded the REMC sales but not pooling arrangement transactions since there was no similarity between the two. The Federal Power Commission's approval of the energy sale does not exclude the Commission from including the plant in the rate base for rate-making purposes. The two functions—interstate sale of energy to pool members and determining what part of a utility's plant is used and useful to its ratepayers—are entirely different functions and do not conflict in their purposes. The Federal Power Act, § 201(b), 16 U.S.C. § 824(b) (1974) exempts "facilities used for generation of electric energy" and "facilities used in local distribution" from Federal Power Commission jurisdiction.

Therefore, the Commission properly included the interconnecting plant of the Petitioner. We find no error.

## VIII.

### Reasonably Necessary

The full capacity of Petitioner's Petersburg Plant Number Two was included in the rate base as used and useful.[23] In addition to the plant "in service" determination, the Commission's "used and useful" standard requires that the plant included in the rate base be reasonably necessary to the efficient and reliable provision of utility service to the public.[24] Ayres' contention of error attacks the Commission's finding

23. *City of Evansville* v. *Southern Ind. Gas & Elec. Co.* (1975), 167 Ind. App. 472, 339 N.E.2d 562, 589.

24. In the "Test Year Revenues" section of this opinion, the Petersburg Plant is discussed as an adjustment to the test year. The Plant's "availability" is discussed in footnote 20.

which included the Petersburg Plant's entire capacity and urges that this capacity should be treated as property held for future use.

The Petersburg Plant has a capacity of 450,000 megawatts. Approximately forty-five percent of this capacity had been sold to the Indiana & Michigan Electric Company under a contract which was to terminate on April 30, 1971, a termination date known within the test year and a termination date within twelve months after June 30, 1970. During the test year and while the contract was in force, the Petitioner had to purchase power to adequately serve its ratepayers.[25] The Commission's Finding Number Five discusses the inclusion of the adidtional plant capacity as follows:

"Even assuming some portion of the power previously supplied to I & M might not be needed immediately to supply regular customers, after using it to replace the amount of power purchased during the test year, it does not follow that the facilities available to supply such power if and when needed are not used and useful for the convenience of the public. It is undisputed that the facilities from which Petitioner made the sales to I & M were planned, designed, constructed, and installed by Petitioner to meet the increasing demands of its regular customers in its service area, and the opportunity to effect a short-terms sale to I & M of a portion of its total output pending the development of the energy requirements of its regular customers was a fortuitous circumstance which enabled it to reduce its net operating expenses to the benefit of its regular customers. To the extent that the facilities involved provide available excess power they are akin to a water storage reservoir, provided by a water utility to meet future requirements of its customers. It is axiomatic that it is more economical to construct such a reservoir to meet the long-term needs of the community and customers served thereby, than to undertake piecemeal construction in stages as the need therefor develops from time to time. In such a case the full fair value of the reservoir in service is includable in the rate base of the water utility even though its then current use of the reservoir may be less than its full capacity. Under

---

25. Petitioner purchased $1,324,096.00 worth of power during the test year. $2,843,529.00 was received by Petitioner from Indiana & Michigan Electric under the contract.

such circumstances because of the nature of a reservoir facility the water utility does not have the opportunity temporarily to sell off the unused capacity as Petitioner was able to do in the case of its short-term power sales to I & M."

The attenuated conclusions in the above finding defy any reasonable judicial review. No facts are found which support these broad conclusions. We know that the plant expansion was planned and constructed to meet increasing demands of regular customers. We do not know in terms of relative capacity what that actual or projected demand was when the plant was planned or when the plant was included in the rate base. No specific findings of fact are made by the Commission to support its conclusion that the entire plant is reasonably necessary to provide service to the public. Unnecessary plant capacity is not used and useful for rate making purposes and should not be included. Existing needs and projected needs require a business judgment on the part of utility management. Before the Commission can approve of plant investments for expanded capacity and include that capacity in the rate base, it must make inquiries into the business judgments used and the facts which support them. If it finds that such plant expansions are reasonably necessary for the convenience of the public, it may include the plant expansion in the rate base. The specific findings of fact which support the Commission's conclusion are subject to judicial review. If there is substantial evidence to support the findings, and the conclusions are reasonable, the reasonably necessary determination is sufficient.

Fundamental technological considerations for the expansion of capacity differ between a water utility's reservoir—an inundated ground depression—and a power utility's generating plant. Few realistic analogies can be fairly made. Technological obsolescence and choice of generating fuel are of primary importance to a power utility. These considerations are made even more complex by the large scale expansion necessary to obtain optimum unit production costs. Construc-

tion time for such a large scale power expansion usually takes from four to five years—a time span which may invite unforeseen technological change. Since fuel may approximate one-half of power production expense, other technological considerations besides market fuel costs and fuel availability must be considered by the power utility. Governmental pollution regulations may greatly increase the costs of readily available and economical fuel. Equipment modifications may be extensive as well as expensive. If pooling arrangements are available, expansion of capacity may be postponed until a later date. These considerations and many more besides the demand for service must be considered by a power utility. They are substantially different from those of a water utility.

The Commission's finding which includes the entire capacity of the Petersburg Plant Number Two suggests that any demand beyond the test-year capabilities of the Petitioner would justify any level of plant investment to increase capacity. It further suggests that bad business judgments as to plant capacity reasonably necessary to provide utility service is a risk of the ratepaying public and not the utility. Neither suggestion is true.[26]

On remand, the Commission should formulate specific find-

---

26. The Petersburg Plant addition to rate base is $25,000,000.00. IC 1971, § 8-1-2-23 (Burns Code Ed.) provides:

"Additions and expansions—Duty of commission—Approval required.—The commission shall keep itself informed of all new construction, extensions and additions to the property of such public utility and shall prescribe the necessary forms, regulations and instructions to the officers and employees of such public utility for the keeping of construction accounts which shall clearly distinguish all operating expenses and new construction. Unless a public utility shall obtain the approval by the commission of any expenditure exceeding ten thousand dollars [$10,000] for an extension, construction, addition or improvement of its plant and equipment, the commission shall not, in any proceeding involving the rates of such utility, consider the property acquired by such expenditures as a part of the rate base, unless in such proceeding the utility shall show that such property is in fact used and useful in the public service; Provided, That the commission in its discretion may authorize the expenditure for such purpose of a less amount than shown in such estimate."

ings of basic fact which adequately explain the material considerations underlying its determination that all of Petitioner's Petersburg Plant Two capacity is reasonably necessary.

## IX.

## Used and Useful Direct Current

Direct current service to Petitioner's ratepayers had been scheduled to terminate on December 31, 1971. The Commission included in the rate base $425,000 of Petitioner's direct current plant as used and useful. Ayres contends that this direct current plant addition to the rate base is arbitrary since no pro. forma adjustments have been made for the short life of the direct current plant.

The termination date, December 31, 1971, is beyond the twelve months after June 30, 1970 as provided in the Commission's prehearing order. Even if the termination date were known within the test year, termination did not become effective within the twelve months following the test year. However, some adjustments were made by the Petitioner regarding the useful life of the direct current plant. Petitioner's witness Stone testified as to the depreciated current cost of such property:

"Q. Now, you mentioned just a minute or two ago, Mr. Stone, in reference to the transmission lines and the Direct Current situation, that you had included that material in at a very low per cent. Is my memory right?

"A. We include it, of course, in the Current Cost side of the picture as its full replacement cost, but we have reduced that current cost of the DC property, all property that is contributing to the production of DC current and the delivery of it. This affects, for example, Account 367, Underground Conductors and Devices. There are DC cables that are running in the ducts that have only a short remaining life. For example, in that instance the current cost of those cables devoted to DC service is in the order of $430,000. That has been reduced in these cables to about $165,000,

of which $155,000 is estimated as salvage. That happens to have a very high salvage because of its copper content.

In contrast to that kind of depreciation, the depreciation that applies to the substations themselves—this affects two accounts; one would be the Station Equipment, which is in Account 362—and the current cost of the DC property in that instance is approximately $740,000. And we have reduced that to approximately $37,000. It has only a remaining value through the year of '71. In addition —

"Q. (Interposing) I'm sorry. What was that figure, sir?

"A. $37,000.

"Q. All right. Pardon me.

"A. (Continuing) This would be our estimated value of that equipment at June 30, 1970, because of its very short remaining life.

"Q. All right.

"A. (Continuing) In addition to this, Mr. Van Dorn, in Account 361 there are four substation buildings that are also housing the DC equipment. The reason there are four buildings and only three substations is, at the time of our appraisal the equipment in one of these buildings had already been removed; but the Company has some use for these buildings, and it's a very short remaining use but a continued use for some AC controls and a few other things of that sort that do give some remaining value beyond the time when the DC equipment will be removed.

In Account 361, the current cost of those substations for structural portions is $621,000. That has been reduced to $150,000 value, which reflects, as I say, the short remaining life but a continued use of the buildings for certain purposes that the Company has in mind.

"Q. What was the first account number that you gave us, the 423 to 165?

"A. That was Underground Conductors and Devices, Account 367.

"Q. Now, the Direct Current property would be chiefly in these three area that you just mentioned?

"A. It would be entirely within that; yes, sir."

We have examined the record and find substantial evidence to support the Commission's determination which included the direct current property in the rate base as used and useful.

## X.

### Tangible State of Efficiency and Property

Ayres contends that the Commission committed error when it considered those intangible items in Petitioner's Exhibit 10 which relate to the state of efficiency of Petitioner's Plant.[27] IC 1971, § 8-1-2-6(a) (Burns Code Ed.) provides that the Commission ". . . give weight to the reasonable cost of bringing the property to its then state of efficiency." Exhibit 10 listed these items:

"1. Cost of training and coordinating personnel.

2. Cost of preparing forms, records, manuals, operating procedures and statistics which aid in developing increased efficiency.

3. Costs arising from lag in use.

4. Debugging and tuning-up plant.

5. Cost of developing customer load growth."

The value of these development cost items was estimated by Petitioner's witness, Mr. Stone, to be five percent of current cost of plant or $20,000,000.00.

Ayres' contention of error is predicated upon the statutory prohibition that ". . . All public utility valuations shall be based upon tangible property, . . ." IC 1971, § 8-1-2-6(b) (Burns Code Ed.). It contends that this prohibition cannot harmoniously be reconciled with the statutory directive in section (a) *supra*, that the Commission ". . . give weight to the

---

27. The issue discussed in this opinion is very narrow: did the Commission commit error by considering the items set out in Exhibit 10? The lack of stated policy guidelines as to what category of items would be considered and the lack of any statement by the Commission as to the weight given to any of the items in computing fair value has not been raised.

reasonable cost of bringing the property to its then state of efficiency."[28] We disagree. Such a narrow construction would make the entire statute inoperative.

The term "tangible property" which is used to designate the statutory prohibition refers to tangible plant which is used and useful for the convenience of the public. Current cost of tangible plant property does not necessarily reflect its fair value for rate-making

---

28. The original Shively-Spencer Utilities Act, ch. 76, § 9, [1913] Ind. Acts 167, provided:

". . . As one of the elements in such valuation the commission shall give weight to the reasonable cost of bringing the property to its then state of efficiency. . . ."

In 1933 clause (b) was added to the Act which is the prohibitionary clause relied upon by Ayres. It provides:

"(b) The lands of such public utility shall not be valued at a greater amount than the assessed value of said lands exclusive of improvements as valued for taxation. In making such valuation no account shall be taken of presumptive value resting on natural resources independent of any structures in relation thereto, the natural resource itself shall be viewed as the public's property. No account shall be taken of good will for presumptive values growing out of the operation of any utility as a going concern, all such values to rest with the municipality by reason of the special and exclusive grants given such utility enterprises. No account shall be taken of construction costs unless such costs were actually incurred and paid as part of the cost entering into the construction of the utility. All public utility valuations shall be based upon tangible property, that is, such property as has value by reason of construction costs, either in materials purchased or in assembling of materials into structures by the labor or [of] workers and the services of superintendents, including engineers, legal and court costs, accounting systems and transportation costs, and also including insurance and interest charges on capital accounts during the construction period. As an element in determining value the commission may also take into account reproduction costs at current prices, less depreciation, based on the items set forth in the last sentence hereof and shall not include good will, going value, or natural resources." IC 1971, § 8-1-2-6(b) (Burns Code Ed.).

The Act was amended in 1947 but the directive language concerning the state of efficiency remained the same. Also see *Columbus Gas Light Co.* v. *Public Service Comm'n* (1923), 193 Ind. 399, 140 N.E. 538; *Public Service Comm'n* v. *Indianapolis Rys.* (1948), 225 Ind. 656, 662, 76 N.E.2d 841; as to operating expenses used to increase efficiency see *Wichita Gas Co.* v. *Public Serv. Comm'n* (D. Kansas 1930), 3 F.Supp. 722 at 726; for organizational costs, see *In re Brooklyn Borough Gas Co.* (1937 Pub. Serv. Comm'n), 21 P.U.R. (N.S.) 353, 367; *In re West Virginia Water Serv. Co.* (1936 W. Va. Pub. Serv. Comm'n), 17 P.U.R. (N.S.) 40.

purposes. Before any tangible plant property can become used and useful for the convenience of the public, it must be efficiently integrated into a functioning utility system. This integration process may require additional plant development costs for plant modification, plant tune-up, and training of personnel to operate the plant. A substantial amount of additional plant development costs may be necessary to bring a utility's plant to a state of efficient operation so that it may serve the public. When the Commission is attempting to establish the "fair value" of tangible plant property, current cost in some instances may be only a threshold inquiry into the "fair value" of tangible plant property for rate-making purposes. "Fair value" has no meaning in rate proceedings unless such developmental costs are given weight by the Commission. IC 1971, 8-1-2-6(a) (Burns Code Ed.) gives the Commission the discretion to weigh "the reasonable cost of bringing the property to its then state of efficiency" which includes intangible developmental costs. State of efficiency is itself an intangible exception to the statutory prohibition against intangibles.

## XI.
### Deferred Tax Expense Reserve

Petitioner had a deferred tax expense reserve account totaling $23,260,500.00 which included $18,836,000.00 in deferred federal taxes and $4,424,500.00 in unamortized investment credit. The Commission included the deferred tax account in the rate base. Ayres contends that this deferred tax account should have been excluded from the rate base, since it is consumer contributed capital. Ayres contends that the Petitioner should not earn a rate of return on capital which has not been advanced by its investors. We agree.

This same issue and substantially the same argument was advanced in *City of Evansville* v. *Southern Indiana Gas & Electric Co.* (1975), 167 Ind. App. 472, 339 N.E.2d 562. In

*City of Evansville,* we held that ". . . the method adopted by the Commission for the treatment of Petitioner's 'deferred tax'. reserves results in a schedule of rates which are not 'reasonable and just' to the extent that the method permits the petitioner to obtain a return on funds contributed by consumers. IC 1971, 8-1-2-4." 339 N.E.2d at 587. We remand this issue for further proceedings not inconsistent with our opinion in *City of Evansville,* and we make the same disposition here.

## XII.
### Automatic Fuel Adjustment Clause

The proposed rate increase for industrial and commercial ratepayers included an automatic fuel adjustment clause. This clause provided:

"FUEL COST ADJUSTMENT:
The bill calculated according to the preceding section entitled 'Rate' is subject to a fuel cost adjustment applicable, with respect to all energy consumed, when the weighted average cost of fuel (except nuclear) burned for the production of electric energy in Company-owned plants during the second month next preceding the billing period under consideration is either a full 0.5¢ (½ cent) less than 25.6¢ million B.T.U. Such bill will be increased or decreased, respectively, in the amount of .00543¢ per KWH for each such full 0.5¢ (½ cent) increase or decrease above or below said 25.6¢ weighted average cost per one million B.T,U., but only when the increase or decrease amounts to 10 cents or more per bill. The weighted average cost of fuel burned shall be determined in accordance with the applicable uniform system of accounts prescribed by Public Service Commission of Indiana."

Ayres contends that the use of an automatic fuel adjustment clause to review the rate to be charged industrial and commercial ratepayers without prior Commission approval constitutes an unlawful sub-delegation of legislative rate-making authority.

This Court recently dealt with the same sub-delegation argument in *City of Evansville* v. *Southern Indiana Gas &*

*Electric Co.* (1975), 167 Ind. App. 472, 339 N.E.2d 562. We concluded in *City of Evansville* that the use of an automatic fuel adjustment clause was not an unlawful sub-delegation of legislative rate-making authority. However, some procedure must be operative which subjects automatic rate adjustments to prior Commission scrutiny and approval.[29] As in *City of Evansville,* the record contains no evidence of any formal or informal approval procedures employed by the Commission; therefore, we remand this cause to the Commission for a written statement of the procedures it has followed in approving Petitioner's automatic fuel adjustment revision of rates.[30]

## XIII.
### Discriminatory Rates

In the proposed schedules of rates, the automatic fuel adjustment clause applied only to industrial and commercial ratepayers. It did not apply to residential ratepayers. Ayres contends that this difference in application of the automatic fuel adjustment clause amounts to discriminatory rates. It must pay the added expense of fuel while residential ratepayers do not. This contention is disposed of in the Commission's Order by a reference to the Petitioner's application for the fuel adjustment clause to be applied to residential rates as well as commercial and industrial:

> "In these proceedings Petitioner sought authority to extend the fuel adjustment clause provisions to its residential rate schedules. This request we deny."

No finding or statement of policy is made in support of this determination. *In re Alabama Power Co.* (1969 Ala. Pub. Serv. Comm'n), 83 P.U.R.3d 321, 344, is cited earlier in

---

29. Lack of incentive to purchase fuel at competitive prices may under some circumstances justify the suspension of the automatic fuel adjustment clause. *In re United Gas Pipe Line Co.* (1961 La. Pub. Serv. Comm'n), 38 P.U.R.3d 209.

30. The automatic fuel adjustment clause mechanism has been used by this Petitioner to revise industrial and commercial rates since 1938.

Finding Nine of the Commission's final order and gives the automatic fuel adjustment clause:

> " '. . . In this connection the commission is fully aware of the fact that the customers receiving residential service do not have the opportunity to deduct any portion of the payments they make for purposes of federal and state income taxes, whereas it is fully recognized by the commission that, by and large, all commercial and industrial customers can recover a substantial portion and up to approximately 50 per cent of the electric bills through the computation of their federal and state income taxes.' "

We cannot determine from a reading of Finding Nine of the Commission's Order whether the Alabama tax policy has been adopted as the Commission's reason for denying the Petitioner's application and dispensing with Ayres' discrimination argument. We therefore remand to the Commission for clarification of its determination.[31]

## XIV.

### Indianapolis Contract

The automatic fuel adjustment clause did not apply to a five-year contract between the Petitioner and the City of Indianapolis to provide street and highway lighting. As requested by the Petitioner, the contract rate was not increased by the Commission. Ayres contends that this lack of fuel adjustment application and failure to increase the contract rate of Petitioner is discriminatory. In Finding Nine, the Commission made these observations:

> "No increase was made in the street and highway lighting rate because, as the evidence shows, this is a contract rate

---

31. "Rates for different classes of service need not be uniform or equal or equally profitable to the utility; the prohibition is against unreasonable or undue discrimination in the application of rates." *City of Pittsburgh* v. *Pennsylvania Pub. Utility Comm'n* (1951), 168 Pa. Super. 95, 78 A.2d 35, 38; See also *In re Maine Pub. Serv. Co.* (1956 Me. Pub. Util. Comm'n), 14 P.U.R.3d 405; *In re Lynn Gas & Elec. Co.* (1947 Dep. 4 of Pub. Util. Mass), 70 P.U.R. (N.S.) 22; *In re Virginia Elec. & Power Co.* (1954 Va. Corp. Comm'n), 7 P.U.R.3d 108; however, some rationale, principled reason or statement of policy must be given for the different application for any meaningful judicial review of reasonableness.

the contract for which was negotiated by Petitioner with the City of Indianapolis on the basis of updated costs late in 1969 and continues for a period of five years. The contract was filed with the Commission following its execution by Petitioner and the City. . . .

\* \* \*

"With respect to the street and highway lighting rate, apart from the fact that historically this service has been the subject of special contracts filed with the Commission to reflect cost changes from time to time it should be noted that service of this character is largely affected by considerations of public policy in recognition of the fact that the service is not for the exclusive benefit of the governmental authorities called upon to pay the charges assigned thereto, and that it is frequently deemed proper that the costs of rendering such service should be shared by ratepayer and taxpayer groups alike, since each draws benefits therefrom."[32]

Expert witnesses Keller and Vander Veen testified that an informed judgment was required to establish Petitioner's contract rate with the City of Indianapolis. They testified that no cost study had been developed which would accurately develop a contract rate. The rate equation is further complicated by such factors as the utility's advantage to serve the contract during off-peak periods, added efficiency to plant operation, reliability of service to other classes of ratepayers, and competition between utilities to serve the contract. In conjunction with service rate under the contract, the Petitioner has a substantial investment in street and highway lighting equipment installed. When negotiating a new contract, the Petitioner must be competitive with other utilities willing to supply this service. Mr. Keller testified that a failure to be competitive could result in the removal of the street and highway lighting equipment installed by the Petitioner and a switch to another utility for service. He stated that this happened in New York and New Orleans.

---

32. This Court is not familiar with the public policy referred to by the Commission. The policy suggests that ratepayers and taxpayers should share the City of Indianapolis' contract cost for street and highway lighting. Are ratepayers and taxpayers identical? How does "benefit of governmental authorities" become involved?

No contract cost was established by the evidence, although the evidence indicates the establishment of a contract cost is possible. Whether the contract rate is just and reasonable and not discriminatory as to other ratepayers is not discernible from the evidence. The contract was negotiated and the rate established upon the informed judgment of the Petitioner. The contract rate was accepted by the Commission as a matter of public policy. Nothing in the Commission's Order indicates that the judgment of the Petitioner should be adopted by the Commission and the reasons for adopting such judgment. The public policy referred to by the Commission is ill-defined, and we are unable to determine whether that public policy enunciated by the Commission is reasonable for the establishment of a non-discriminatory contract rate. Therefore, we remand to the Commission for a more informative statement of its public policy and any other statement it deems appropriate in the establishment of the Petitioner's contract rate with the City of Indianapolis.

## XV.

### Rate M v. Rate J

Ayres contends that there is not substantial evidence to support the Commission's finding that Rate M is a different type of service than Rate J. It contends that ". . . the only difference between service for Rate J customers and Rate M customers is that Rate M customers are served by underground lines and Rate J customers are served by overhead lines." We disagree.

In Finding 9 of the Commission's Order, the Commission stated:

"In order to qualify for Rate J one essential is that the current be supplied from overhead lines at primary voltage through transformers and other substation equipment owned by Petitioner, and delivered at a point on customer's premises through transformers, lines and other equipment owned, installed, operated and maintained by the customer.

Such rate is somewhat lower than Rate M. Under Rate M all downtown customers are served by a network of underground wires and related facilities. Current is delivered at secondary voltage through a single metering installation and all transformers and supplementary equipment are owned, installed, operated and maintained by Petitioner, and no discount is allowed for customer ownership of transformation facilities. Consequently such customers cannot qualify for Rate J. Intervenors contend that the distinction between customers served by overhead lines and customers served by underground lines is arbitrary and capricious and unjustly discriminatory against customers in the downtown area. Their proposal is to modify Rate J by deleting the word 'overhead' from the Character of Service clause of such rate. However, the evidence is undisputed that the service rendered to customers in the downtown area is an entirely different type of service from that rendered to customers outside such area who qualify for Rate J. The nature of the required downtown area facilities is such that the M Rate customers served thereby receive a higher and more reliable type of electric service, and the facilities from which they are served cannot be segregated in the same manner as can the facilities from which Rate J customers are served from overhead lines. Consequently, the limitation of Rate J to customers who can be served from overhead lines is neither arbitrary, capricious nor unjustly discriminatory, and there is no basis for the change in Rate J proposed by Intervernors."[33]

There is substantial evidence to support the Commission's finding that Rate M is a higher and more reliable type of electrical service. Petitioner's witness Keller testified that the Rate M Network "is a higher quality service than overhead Rate J is. It's a higher quality service because it's completely integrated circuitry so that any failure will not take out a customer. Now this improves both the voltage regulation and it improves the reliability. And you do not have this on Rate J."

Rate J provides for primary distribution voltage through transformers while Rate M provides for secondary voltage.

33. This finding exemplifies the type of finding necessary for appellate review and could serve as a model. It states the primary evidence upon which the factual conclusions are based and then makes a reasonable finding.

Rate J customers must install, operate and maintain their own transformers, lines, and other equipment on their premises while the Rate M customers do not. Furthermore, the Petitioner's underground network facilities which provide Rate M service cannot be segregated as overhead facilities or segregated for Rate J service. None of the Rate M customers in the downtown Indianapolis area can qualify for Rate J, since the City of Indianapolis does not permit the construction of overhead lines.

We conclude that there is substantial evidence in the record to support the Commission's finding that Rate M is a different type service than Rate J. Rate M is a higher and more reliable type of electric service than Rate J.

## XVI.

### Rate Case Expense

The Commission allowed the Petitioner to amortize its rate case expense over a 4-year period.[34] Ayres contends that the Commission abused its discretion since the ". . . last time IPALCO had requested an electric rate increase was 1934 or 1938 . . . or a period of at least thirty-two (32) years prior to its 1970 filing of the petition in this case. . . ." We conclude that the period for amortization of rate expenses does not depend upon the last petition for a rate increase, but it does depend upon sound

---

34. Ayres contends in its brief at page 1309 that the $430,000 rate case expense should be amortized over a 32-year period since this was the last time that the Petitioner applied for a rate increase. In Finding 8 of its Order, the Commission stated:

"The only expense adjustment proposed by the Public which was challenged by Petitioner related to the amortization of rate case expense. Petitioner proposed a three-year amortization period and the Public proposed a period of five years. In addition the Public proposed a disallowance of $62,000 of the amount claimed by Petitioner for this purpose, and Petitioner did not question that proposal. In recent cases of other public utility companies before us we have generally approved a four-year period for the amortization of rate case expense and we deem that period to be appropriate in this instance. . . ."

accounting practices in the light of the present economic conditions known to the Commission through its regulation of similarly situated utilities. The Commission did not abuse its discretion.

In addition to the Commission's own knowledge of other similarly situated utilities which have requested rate increases, Petitioner's witness Fitzwater testified that in his opinion the Petitioner would be petitioning for another rate increase by 1975 since the cost of equipment, labor rates, and other operating expenses were still rising. Ayres presented no evidence to the contrary. Although the Commission may consider the Petitioner's last request for a rate increase which was made thirty-two years ago, the last request for a rate increase does not preclude the Commission from considering other economic factors.

## XVII.

### Expert Witness
### Cost of Service Study

Ayres contends the Commission abused its discretion when it permitted Petitioner's witness, Vander Veen, to testify as an expert as to Petitioner's Exhibit 11, a cost of service study.[35] Ayres contends that Vander Veen's training is in business economics and finance, and that an expert on cost of service should have formal engineering training. Therefore, Mr. Vander Veen was not qualified as an expert.[36]

Mr. Vander Veen's college degree was in economics and finance, but this occupation was that of a rate consultant with Stone and Webster Consultants. His employer, Stone and Webster Consultants, had long experience in providing consulting and advisory services in connection with the operation and development of public utilities. After his graduation, Vander Veen was employed in the rate department of a large

---

35. The cost of service study allocates plant and expenses to a class of service.

36. Ayres' assignment of error 74 at page 1313 of their brief.

electric utility where his experience included cost and service studies, design of electric utility rates, load research, computer application of rates, design and analysis, economic evaluations, and other related studies in cost service. After five years with this large electric utility, he joined Stone and Webster Consultants in 1968. His duties as a member of the rate department included the preparation of cost of service studies, pro forma adjustments to plant and expense, rate design and analysis, revenue requirement studies, and other public utility analysis. He has also appeared before the Michigan Public Service Commission to testify on cost of service studies.

In *Isenhour* v. *State* (1901), 157 Ind. 517, 528, 62 N.E. 40, 44, our Supreme Court stated:

"The general rule, in such cases, in this State at least, seems to be that where a witness exhibits such a degree of knowledge, gained from experiments, observation, standard books, or other reliable source, as to make it appear that his opinion is of some value, he is entitled to testify. . . ."

We conclude that the Commission did not abuse its discretion when it permitted Mr. Vander Veen to testify as an expert upon Exhibit 11 as to certain cost of service studies. The objection to his testimony is an objection to the weight that may be given to it rather than to the admissibility of his testimony.

## XVIII.

### EBASCO Separation Study

The petitioner's total plant produces steam as well as electricity. To establish only electrical rates for this hearing, the Petitioner had to separate steam plant from electrical plant. This separation was accomplished by employing a separation study identified as the EBASCO study or Petitioner's Exhibit Number Nine. In Finding Four of the Commission's Order, the Commission approved ". . . the allocation methods and formulas set forth in *Petitioner's Exhibit No. 9* and the use

thereof for the purpose of this proceeding." Ayres objects to the admission of Exhibit 9 upon two grounds: (1) The EBASCO study is hearsay; and (2) The Commission violated its pre hearing conference order by permitting witness Bellin to further qualify the EBASCO study after all parties had rested.[37]

Petitioner's witness Vander Veen, whose qualifications to testify as an expert about the EBASCO study was never questioned by Ayres, testified that he had reviewed and considered the allocation methods and formulas in the EBASCO study. He was satisfied that these methods and formulas were fair and reasonable to furnish a proper basis for effecting a separation of steam and electrical plant. Vander Veen was asked by Ayres on cross-examination:

"Q. Did you use the Ebasco report in your work?

"A. The Ebasco Report was used in the separation of the Steam Facilities from the Total Plant of the Company to arrive at Electric Plant and Expense.

"Q. Does that report make any allocation of Plant between wholesale and retail?

"A. No, it does not. It is a report used only to separate from the Steam Sales, Steam Plant and expenses from the books and records of the Company." (Tr. p. 528, 11. 1 to 10)

We have reviewed Vander Veen's testimony and conclude that his testimony presents substantial evidence to support Commission's Finding Number Four.[38]

---

37. No objection was made to the fairness and reasonableness of the EBASCO study for the purpose of separating electrical plant from steam plant to establish an electrical rate.

38. "4. *Petitioner's Non-Electric Operations.* At June 30, 1970 a portion of Petitioner's total utility plant in service was in joint use for both its electric utility operations and its steam utility operations. This made necessary a separation and allocation of such utility plant and associated operating expenses, including depreciation and taxes, between the two separate utility services. The separation was made by Petitioner on the basis of the allocation methods and formulas contained in *Petitioner's Exhibit No. 9,* and the results thereof were reflected in *Petitioner's Exhibits Nos. 1, 2, 7, 8, 10, 11 and 13.*

Allocation methods and formulas for the separation of Petitioner's electric and steam operations were originally established for it in 1953 by Ebasco Services, Incorporated, an independent organization of utility

Having determined that there is substantial evidence to support finding Four of the Commission's Order which approved Petitioner's Exhibit Nine, we do not need to extend the length of this opinion by discussing Ayres' objection to the reopening of the hearing for witness Bellin's testimony. Our examination of the records shows that there were several rulings on evidentiary matters which had not been made and were pending further action by the Commissioner-Examiner. Assuming, *arguendo*, that witness Bellin's testimony was incompetent or immaterial to the purpose for which Exhibit Nine was offered, it is well established that the admission of incompetent or immaterial evidence will not justify setting aside administrative agency action if there is substantial evidence to support the agency's decision. *State ex rel. Byers* v. *School City of Evansville* (1941), 219 Ind. 288, 37 N.E.2d 934; *Warren* v. *Indiana Tel. Co.* (1940), 217 Ind. 93, 26 N.E.2d 399. Therefore, we find no error in Commission's Finding Number Four.

---

consultants, engineers and constructors, and since that date have been updated and kept current by periodic review and revision by such organization when and to the extent necessary to reflect changes in the operating characteristics of Petitioner's total utility plant and the operating conditions on its total system.

The basic allocation methods and formulas as in effect during the period 1957-1960 were reviewed by the Commission in proceedings then before it in Cause Nos. 27529 and 28086, involving the steam utility rates of Petitioner, and one each occasion were approved by the Commission and found to be reasonable and to form a proper basis for determining the rates prescribed by it for Petitioner's steam utility service in 1958 and reconfirmed by it in 1960.

The allocation methods and formulas as in effect from time to time have been the basis upon which Petitioner has filed its annual reports with the Commission in reporting its electric and steam utility plant and the results of its operations from such separate utility services, and the allocation methods and formulas now in effect, which are not materially different from the ones previously reviewed and approved by the Commission, are based upon and reflect the design characteristics, function and use made of Petitioner's Electric Properties and the utility plant used jointly in its electric and steam operations during the test year ended June 30, 1970. The witness Bellin for Petitioner testified that such allocation methods and formulas were fair and reasonable and appropriate for the purposes for which they were used by Petitioner in this cause, and there is no evidence of record as to any other suggested applicable methods and formulas for making such allocations. We therefore approve the allocation methods and formulas set forth in *Petitioner's Exhibit No. 9* and the use thereof for the purpose of this proceeding.

## XIX.
### Rule 1.3

Ayres contends that Rule 1.3 of Petitioner's Rules and Regulations is discriminatory and not supported by the evidence. It further contends that the Rule is ". . . arbitrary, capricious and illegal." The Rule provides that when more than one rate is applicable to the service of a customer, the customer shall designate which rate is desired. A customer may change from one rate to another once during the first contract year, effective retroactively to the date of connection, and once at the end of each year thereafter, but not effective retroactively. Ayres proposed that the Rule be changed so that the Petitioner would have to determine the most favorable rate for the customer which would require a survey by the Petitioner of the customer's present and future business needs. The Commission denied the Rule change proposed by Ayres.

There is substantial evidence in the record to support the Commission's finding that it would be an unreasonable burden for the Petitioner to predict the general economic changes in each customer's business in order to establish the most economical rate. As Mr. Keller testified:

"Sometimes customers start businesses and we don't know what their demand is going to be, neither do they."

We conclude that the Commission's finding is based upon substantial evidence in the record and that its conclusion based upon that evidence is reasonable. We find no error.

## XX.
### Rule XIV (c), (g)

Ayres contends that Rule XIV (c), (g) was violated when the Commission did not serve it with a copy of Petitioner's proposed order. We disagree. First, the Rule is silent upon proposed orders submitted by parties. Secondly, no examiner's recommended order was submitted. Thirdly, we find no proposed order by Petitioner in the record.

Rule XIV (c), (g) of the Public Service Commission's Practice and Procedure, Ind. Admin. Rules & Regs. (54-401) — 14 (c), (g) provides:

"(c) Notice of hearings, examiner's reports and recommended orders and rulings and orders of the Commission will be served by the Commission upon all parties of record.

* * *

"(g) Proof of service shall be made by acknowledgment, certificate of attorney or affidavit."

No reference is made in the above Rule to a proposed order submitted by a party. As a matter of practice, a party may submit as many proposed orders before and after a hearing as it desires. Only the examiner's recommended order to the Commission is served upon the parties under this Rule and only the examiner's recommended order may be objected to under Rule XIV (a). See Ind. Admin. Rules & Regs. (54-401)-14 (a), which provides for the filing of an original and four copies of exceptions to the examiner's recommended orders.)

Commissioner William B. Powers conducted this rate hearing. The record indicates that no examiner's recommended order was ever prepared for service upon the parties as contemplated under subsection (c).[39] Therefore, we conclude that the Commission did not violate the express language and intent of Rule XIV (c). Further, our examination of the record does not disclose any proposed order from the Petitioner to the Commissioner-Examiner. But, assuming *arguendo* that such a proposed order was submitted, a failure to serve a copy of the proposed order upon Ayres would not have been a violation of Rule XIV which makes no provision for the

---

39. Where a commissioner-examiner presides at a hearing, any proposed order received from a party which is later recommended to the full commission should be served ". . . by the Commission upon all parties of record." However, we find no proposed order from the Petitioner in the record and nothing to indicate that the final order of the Commission was substantially the proposed order submitted by the Petitioner. Furthermore, the record does not show that the examiner-commissioner submitted a recommended order to the full Commission. Such a recommended order whether prepared by a party or prepared solely by the examiner-commissioner should have been served upon the parties prior to its being considered for adoption by the full Commission.

service of a party's proposed order to the examiner. Only recommended orders from the examiner to the full Commission need to be served upon the parties.

Affirmed in part and remanded with instructions for further proceedings consistent with this opinion.

Buchanan, P.J., concurs; Sullivan, J., concurs in part and dissents in part with opinion.

OPINION CONCURRING IN PART, DISSENTING IN PART

SULLIVAN, J.—The holdings of the majority opinion are contained in Parts III through XX thereof. It is to these parts that I address my separate opinion, but would note that Parts I and II of the majority opinion are identical with Parts I and II of *City of Evansville* v. *Southern Indiana Gas & Electric Co.* (1975), 167 Ind. App. 472, 339 N.E.2d 562 and I would therefore reaffirm the "Preliminary Statement" contained in my separate opinion in that case. 339 N.E.2d 595-596.

I concur in Parts III, V, VII, VIII, X, XII, XIII, XIV, XV, XVII, XVIII, XIX and XX. My views with respect to Parts IV, VI, IX, XI and XVI are hereinafter set forth.

## IV.
### JURISDICTIONAL NOTICE

I agree that the Commission had jurisdiction to issue its rate order. I do not however agree with the majority's categorization of the statutory notice requirements as "jurisdictional", in the sense of subject matter jurisdiction. To be sure, failure of notice or defective notice gives rise to due process questions and might render an administrative order void, but it is inaccurate, I believe, to cloak the question in jurisdictional garb. *But see City of New Haven* v. *Indiana Suburban Sewers, Inc.* (1972), 257 Ind. 609, 612-13, 277 N.E.2d 361 at 362-363. Even if the requisite statutory notice by publication be considered truly jurisdictional, once given, such publication confers jurisdiction which is not lost by the granting of a con-

tinuance and a failure to publish a new notice. *See City of New Haven, supra.*

In any event, all intervenors in this proceeding and the Public Counselor appeared and participated in the hearing held on the date set by the continuance order. Intervenors were therefore not prejudiced by any lack of notice. *City of New Haven* v. *Indiana Suburban Sewers, Inc., supra.*

## VI.
## TEST YEAR REVENUES

I dissent from the express holding of the majority that the Commission did not err by excluding testimony regarding the number of revenue producing ratepayers on May 1, 1971. That holding is sought to be supported, at least in part, by the statement that "[t]he testimony would establish a going level adjustment outside the test year which was not known within the test year." I am unable to place any significance upon this statement because the prehearing order authorizing pro forma adjustments established the test as "known, fixed and measurable" within twelve months of the test year—not "known, fixed and measurable" within the test year itself.

The very purpose of test years and pro forma adjustments is to reflect the future as accurately as possible. When future needs, revenues etc., are clearly and accurately establishable, such evidence should be admitted. The majority says precisely this at pages 33-37 of its opinion. Such evidence should be admitted even if, in order to do so, the prehearing order relative to the permissible period for pro forma adjustments must be modified.

In any event, the prehearing order here permitted adjustment with respect to accounting and financial matters within twelve months of June 30, 1970. The evidence excluded concerned service and revenues as of May 1, 1971—within the authorized twelve month period.

As we said in *City of Evansville, supra:*

"The Public Service Commission Act imposes no require-
ment that the data utilized by the Commission be wholly
derived from historical information, On the contrary, the
Act invests the Commission with broad discretionary au-
thority to formulate the accounting systems and adjustment
methods best suited to its particular needs [citation omitted]
... We must reject the city's assertion that the adoption of
an adjustment method allowing the use of estimated data
is not reasonably related to the Commission's primary
objective of obtaining the most accurate representation of
petitioner's future operations. The expert use of estimates
is an integral part of the rate process." 339 N.E.2d at 574.

Certainly, if estimates of future revenues and expenses are
permissible, evidence which fixes such revenues and expenses
with greater degree of certainty is appropriate, if not essential.

Accordingly, I would reverse the Commission on this issue.

## IX.
## USED AND USEFUL DIRECT CURRENT

The majority places significance upon the fact that termina-
tion of direct current service was to occur after 12 months
from the end of the test year. I do not. As discussed under
Issue VI, adjustments are proper if "known, fixed and meas-
urable" within the 12 month period following the end of the
test year. Such is the case here.

## XI.
## DEFERRED TAX EXPENSE RESERVE

Subject to the reservations which I expressed concerning
certain dictum in *City of Evansville, supra,* 339 N.E.2d at
598, I concur in the remand to the Commission for reconsidera-
tion of this issue.

## XVI.
## RATE CASE EXPENSE

I dissent.

The mere fact that "in recent rate cases of other public
utility companies before us we have generally approved a

4-year period for the amortization of rate case expense", (Commission Finding No. 8) is insufficient basis for the Commission to conclude "that period to be appropriate in this case".

As stated in my separate opinion in *City of Evansville, supra,* 339 N.E.2d at 596 "material issues, in my estimation, include those involving 'policy' determinations as well as those which are purely factual so long as reasonable policy application depends upon the presence or absence of certain varying factual considerations. We therefore must have a basis, whether it be evidentiary or a statement of policy reasons by the Commission, before we can determine, as we must, that the rate order is reasonable under the law."

NOTE.—Reported at 351 N.E.2d 814.