# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**JEROME E. POLK**
Polk & Associates
Davie, Florida

**JENNIFER A. WASHBURN**
Citizens Action Coalition of Indiana, Inc.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

Duke Energy Indiana, Inc.:
**JON B. LARAMORE**
**JANE DALL WILSON**
Faegre Baker Daniels LLP
Indianapolis, Indiana

**KELLEY A. KARN**
**ELIZABETH A. HERRIMAN**
Duke Energy Indiana, Inc.
Plainfield, Indiana

Office of Utility Consumer Counselor:
**A. DAVID STIPPLER**
**RANDALL C. HELMEN**
**LORRAINE HITZ-BRADLEY**
Office of Utility Consumer Counselor
Indianapolis, Indiana

FILED
Sep 08 2014, 9:03 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |  |
|---|---|---|
| CITIZENS ACTION COALITION OF INDIANA, INC., SAVE THE VALLEY, INC., SIERRA CLUB, and VALLEY WATCH, INC., | ) ) ) ) | |
| Appellants-Intervenors, | ) ) | |
| vs. | ) ) | |
| DUKE ENERGY INDIANA, INC., | ) | No. 93A02-1305-EX-394 |
| Appellee-Petitioner, | ) ) | |
| INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR, | ) ) ) | |
| Appellee-Statutory Party. | ) ) | |

**September 8, 2014**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Sierra Club, and Valley Watch, Inc. (collectively, "Intervenors") appeal the order of the Indiana Utility Regulatory Commission ("the Commission") approving Duke Energy Indiana, Inc.'s ("Duke") request to include power plant construction costs incurred from October 1, 2011 through March 31, 2012 in a rate adjustment rider.

On appeal, Intervenors raise the following restated issues:

I.  Whether the Commission erred when it authorized Duke to pass on to ratepayers 100% of Duke's requested financing costs for the period under review when the Commission's authorization was made in the absence of findings of fact and conclusions thereon regarding costs incurred during a three-month delay; and

II. Whether the Commission erred by allowing Duke to consider 50% of the power plant to be "in-service," and thereby increase customer rates, despite Duke's admission that the plant had not reached its "In-Service Operational Date" as that term was defined in a Commission-approved settlement agreement to which Duke was a party, when such determination was made in the absence of Commission findings of fact and conclusions thereon.

---

[1] Kari A.E. Bennett was absent when the Order at issue was approved on April 3, 2013.

2

We remand for additional findings.

## FACTS AND PROCEDURAL HISTORY[2]

In 2006, Duke operated a coal and oil-fired generating station at its Edwardsport facility in Knox County, Indiana. The facility, which had a capacity of 160 megawatts, had been placed "in-service" between 1944 and 1951, and was nearing the end of its useful economic life. On September 7, 2006, Duke and Southern Indiana Gas and Electric Company, d/b/a Vectren Energy Delivery of Indiana, Inc.[3] filed a Verified Petition with the Commission, pursuant to Indiana Code chapters 8-1-8.5, 8-1-8.7, and 8-1-8.8, requesting the issuance of applicable certificates of public convenience and necessity ("CPCN") and applicable certificates of clean coal technology for the construction of a 630-megawatt capacity, integrated gasification combined cycle ("IGCC") power plant at the Edwardsport location. An IGCC generating facility converts coal into synthesis gas, which is used to fuel highly efficient combustion turbines.

In the Verified Petition, Duke requested: approval of the estimated costs and construction schedule of the IGCC Project ("the Project"); authority pursuant to Indiana Code section 8-1-8.8-12 to recover construction and operating costs associated with the

---

[2] Oral argument was held on June 25, 2014 at Purdue University's Krannert Graduate School of Management. We extend our thanks to counsel for the quality of the oral and written arguments, for participating in post-argument discussions with the audience, and for commuting to West Lafayette. We especially thank the Executive Education Program at the Krannert Graduate School of Management for their accommodations and the students in the audience for their thoughtful post-argument questions.

[3] Vectren later withdrew from the IGCC Project.

Project on a timely basis via applicable rate adjustment mechanisms;[4] authority to use accelerated depreciation for the Project; approval of certain additional financial incentives associated with the Project; authority to defer its property tax expense, post-in-service carrying costs, depreciation costs, and operation and maintenance costs associated with the Project on an interim basis until the applicable costs are reflected in Duke's retail electric rates; and authority to recover other related costs associated with the Project. *In re Duke Energy Ind., Inc.*, 43114, 2007 WL 4150583 (Nov. 20, 2007). Duke also asked the Commission to conduct an ongoing review of the construction of the Project. *Id.*

Pursuant to Indiana Code section 8-1-1.1-5.1, the Indiana Office of the Utility Consumer Counselor ("OUCC") participated in the proceedings before the Commission on behalf of consumers and ratepayers. Intervenors, Duke Energy Indiana Industrial Group ("Industrial Group"), and Nucor Steel, a Division of Nucor Corporation ("Nucor"), among others, were additional parties to this proceeding.

On November 20, 2007, the Commission issued its final order in consolidated Cause Numbers 43114 and 43114-S1 and made several determinations, including: (1) approval

---

[4] The Commission is required to provide new energy generating facilities with the financial incentive of being able to *timely recover* from ratepayers, through a rate adjustment mechanism, the costs incurred in the construction of the facility. Ind. Code § 8-1-8.8-12(a) (emphasis added). An eligible utility must apply to the Commission for approval of a rate adjustment mechanism. I.C. § 8-1-8.8-12(b). Such application must include at least a schedule for completion of the construction and a statement of the amount of capital investment being made by the applicants. I.C. § 8-1-8.8-12(c). As applicable, the Commission shall allow an eligible business to recover: (1) the costs associated with qualified utility system property; and (2) qualified utility system expenses. I.C. § 8-1-8.8-12(d). A retail rate adjustment mechanism proposed by a utility may be based on actual or forecasted data. I.C. § 8-1-8.8-12(f).

of CPCNs for the Project under IC 8-1-8.5[5] and 8-1-8.7;[6] (2) approval of Duke's estimated costs of $1.985 billion as reasonable to complete the Project; and (3) agreement that ongoing review of the construction of and cost recovery for the Project would be conducted in semi-annual proceedings. *Id.* The semi-annual proceedings included a rate adjustment mechanism, the IGCC Rider. In each IGCC Rider, the Commission would review the progress of the Project's construction and consider Duke's request to immediately recover construction costs, financing costs, and other operating costs that Duke had incurred during the previous six-month period. Once approved, these costs were immediately added to customers' rates. Each six-month period was numbered, with the first being IGCC-1, the second IGCC-2, and so forth. In the instant action, Intervenors appeal from the Commission's order ("Order") in the ninth semi-annual review, IGCC-9.[7]

---

[5] Indiana Code chapter 8-1-8.5, which addresses Utility Powerplant Construction, prohibits a public utility from constructing an electric generating facility without first obtaining from the Commission a CPCN stating that public convenience and necessity will be served by constructing the facility. Ind. Code § 8-1-8.5-2. As a condition for receiving this CPCN, the utility must file an estimate of construction costs in such detail as the Commission may require. The Commission must review the continuing need for the facility under construction and, when requested by the public utility, must engage in an ongoing review of the construction progress. Ind. Code § 8-1-8.5-6. Under such a program, the utility must submit, at intervals mutually agreed to by the utility and the Commission, a progress report and any revisions in the cost estimates for the construction. I.C. § 8-1-8.5-6(a).

[6] Indiana Code chapter 8-1-8.7, which addresses Clean Coal Technology, prohibits an electric generating plant from constructing a clean coal technology plant without first obtaining from the Commission a CPCN stating that public convenience and necessity will be served by such technology. Ind. Code § 8-1-8.7-3. Prior to granting this CPCN, the Commission must approve the estimated costs of construction. I.C. § 8-1-8.7-4. Thereafter, the Commission must review the continuing need of the clean coal plant under construction and, when requested by the public utility, must engage in an ongoing review of the construction progress. I.C. § 8-1-8.7-7. Additionally, at intervals mutually agreed to by the utility, the applicant must submit a progress report of the construction as it proceeds and any revisions in the cost estimates for the construction. *Id.*

[7] On September 11, 2013, the Commission entered its order in IGCC-10, the subsequent semi-annual review covering April 1, 2012 through September 30, 2012. 2013 WL 5275998 (Ind. U.R.C.). Intervenors have appealed that order in Case No. 93A02-1310-EX-835.

In May 2008, Duke filed its petition in IGCC-1, which included a request by Duke to revise the projected cost estimate of the Project from $1.985 billion to $2.35 billion and a request for approval to undertake studies related to carbon capture at the Project and for cost recovery for such studies. On January 7, 2009, the Commission issued its order in IGCC-1 approving: (1) Duke's increase in cost estimate to $2.35 billion and its ongoing review progress report; (2) timely recovery from ratepayers of construction and operating costs, including financing, through the IGCC Rider for the six months under review; and (3) studies related to carbon capture at the Project and cost recovery for such studies. *In re Duke Energy Ind., Inc.*, 431114 IGCC-1, 2009 WL 214580 (Jan. 7, 2009). In the subsequent two reviews, the Commission also approved Duke's cost recovery requests in IGCC-2 and IGCC-3.

On November 24, 2009, in connection with IGCC-4, Duke requested approval from the Commission to recover from ratepayers the costs it had incurred during the six-month period ending September 30, 2009. Duke also requested a subdocket, referred to as IGCC-4S1, asking the Commission to approve an increase to the cost estimate for the entire project. *In re Duke Energy Ind., Inc.*, 2012 WL 6759528 (Ind. U.R.C., Dec. 27, 2012). Under IGCC-4S1, Duke initially requested an increase in the Project's cost from $2.35 billion to $2.88 billion including allowance for funds used during construction ("AFUDC"). *Id.* Subsequently, Duke proposed to voluntarily cap the costs that it would seek from customers and sought approval of a Project cost estimate of $2.72 billion in direct construction costs, plus all associated AFUDC costs on the $2.72 billion for a total of approximately $3 billion. *Id.*

6

On July 28, 2010, the Commission issued its interim order in IGCC-4, approving Duke's six-month costs and the IGCC Rider on an interim basis, pending the outcome of IGCC-4S1. On September 17, 2010, Duke, Industrial Group, and the OUCC submitted a settlement agreement to the Commission in IGCC–4S1, which set a hard cap cost of $2.975 billion on the construction costs of the Project. Subsequently, amidst an ethics scandal involving Duke and the Commission, the settlement agreement was withdrawn.

About two years later, on April 30, 2012, Duke filed a modified settlement agreement in IGCC-4S1 ("Agreement") to which Duke, Industrial Group, OUCC, and Nucor were all parties. *Appellants' App.* at 321-32. This Agreement included a $2.595 billion hard cost cap for construction costs and provided a partial cap on capital costs up through the Plant's in-service date. *Id*. at 322. The Agreement included conditions that Duke had to meet before the Plant would be declared in-service and also stated that the "In-Service Operational Date shall not be prior to September 24, 2012." *Id*. at 323. Intervenors were not signatories to the Agreement in IGCC-4S1 and actively opposed it being approved by the Commission.

On December 27, 2012, the Commission issued its final order approving the Agreement in IGCC-4S1, again over Intervenors' objections. The Commission simultaneously issued final orders in several other IGCC Rider proceedings that were then pending, but were essentially concluded: Cause Nos. 43114 IGCC-5, IGCC-6, IGCC-7, and IGCC-8. In these Orders, the Commission began implementation of the IGCC-4S1 settlement. *In re Duke Energy Ind., Inc.,* 2012 WL 6759529, (Ind. U.R.C., Dec. 27, 2012); *In re Duke Energy Ind., Inc.,* 2012 WL 6759530 (Ind. U.R.C., Dec. 27, 2012); *In re Duke*

7

*Energy Ind., Inc.,* 2012 WL 6759531 (Ind. U.R.C., Dec. 27, 2012); and *In re Duke Energy Ind., Inc.,* 2012 WL 6759532 (Ind. U.R.C., Dec. 27, 2012).

On June 8, 2012, Duke filed its Verified Petition in the instant action, IGCC-9, requesting:

> [T]hat the Commission, for ratemaking purposes, authorize the addition of the actual expenditures for its IGCC Project made through March 31, 2012, to the value of Petitioner's property. Petitioner further requests that the Commission approve and authorize the requested rate adjustment allowing Petitioner to earn a return on said amount, in addition to the return on value of its used and useful utility property and on its construction work in progress investment previously approved by the Commission. Petitioner also requests recovery of certain other applicable costs and credits via the IGCC Rider, including . . . depreciation, and Indiana Coal Gasification Technology Investment Tax Credit, as well as reconciliation of amounts necessary to adjust the IGCC Rider charges and credits to actual amounts.

*Appellants' App.* at 36-37. That same day, the parties offered written testimony into evidence. That evidence was admitted without objection. Duke's testimony was submitted by W. Michael Womack, Vice President of the Project; Jack L. Stultz, General Manager II, Regulated Fossil Stations; and Diana L. Douglas, Duke's Director of Rates. *Appellant's App.* at 9. Kerwin L. Olson, Executive Director for Citizens Action Coalition of Indiana, Inc., submitted testimony, again without objection, on behalf of Intervenors on December 10, 2012. *Id*. at 10. The pertinent portions of the testimony will be discussed below.

The Commission held a hearing on Duke's petition on January 15, 2013. About two weeks later, Duke filed its post-hearing argument in the form of a Proposed Order. Intervenors filed Exceptions to Duke's Proposed Order on February 21, 2013, setting out the following specific legal and factual objections to the relief Duke requested in this case.

1.      Duke is not entitled to recover financing costs for the three[-]month

8

delay that occurred as a result of events that took place during the review period at issue in this case. Duke failed to carry its burden of proof that the Project financing costs attributable to this three month delay were reasonable and necessary, as required under Indiana Code § 8-1-8.8-12.

2.     Duke should not be permitted to increase customer rates by declaring 50% of the plant "in-service," given that the plant admittedly did not meet the definition of the "In-Service Operational Date" included in the 4S1 Settlement Agreement and approved by the Commission's 4S1 final order. Duke contends the in-service definition in the Settlement is to be used purely for ratemaking purposes. Yet at the same time, Duke's witness Diana Douglas acknowledged that Duke's proposed "partial" in-service declaration will, in fact, increase customer rates.[8]

*Appellants' App.* at 418.

Duke filed a Reply to these arguments on February 28, 2013. *Id*. at 466-85. In

pertinent part, Duke asserted:

3)     no evidence has been presented in this proceeding that the schedule update testified to by [Duke's] witness Mr. Womack was unreasonable or caused by imprudence;

4)     the principles of collateral estoppel or issue preclusion do not apply to this proceeding, which covers an entirely different time period than that reviewed by the Commission in IGCC-4S1;

5)     the determination that a portion of the Edwardsport IGCC Project should be placed in[-]service for income tax purposes does not contravene the Settlement Agreement approved by the Commission in IGCC-4S1, nor does it negatively impact customers;

6)     [Duke's] calculation of its AFUDC is proper and logical, and [Duke]

---

[8] Intervenors raised three objections, two of which they raise on appeal. Intervenors' third objection was:

Under Indiana law, a utility may not earn a return on customer contributed capital. Deferred taxes constitute "customer contributed" capital. Consequently, Duke cannot be permitted to earn a return on deferred taxes as part of its financing costs accrued as allowance for funds used during construction ("AFUDC").

*Appellants' App.* at 418.

9

has not and is not earning a return on its deferred tax balance.

*Id.* at 466-67.

On April 3, 2013, the Commission entered its Final Order in IGCC-9, approving the financing costs that Duke incurred during the IGCC-9 review, which included an alleged $61 million of financing costs that Duke incurred during the three-month delay. The Commission approval allowed Duke to pass along to ratepayers, through the IGCC Rider, all of the IGCC-9 financing costs including the $61 million.

In its order, the Commission set forth "Discussions and Findings," but failed to make findings regarding the reasonableness of the three-month delay or whether 50% of the IGCC Plant was deemed to be in-service. Intervenors now appeal the Commission's order. Additional facts will be supplied where necessary.

**DISCUSSION AND DECISION**

In IGCC-9, the Commission approved Duke's construction progress and granted Duke's request to recover from ratepayers all costs incurred from October 1, 2011 through March 31, 2012. In its order, the Commission set forth the following "Discussions and Findings":

> 6. A. *Ongoing Review Progress Report for IGCC-9.* Mr. Womack testified concerning the IGCC Project progress report and issues relating to start-up, testing, validation, and commissioning activities and explained in detail the schedule delays resulting from the increase in bulk commodity quantities. He explained the IGCC Project has encountered delays in testing and commissioning due to issues that have been uncovered and subsequently corrected. Thus, the facts explored in previous IGCC proceedings relating to the increased commodity quantities continue to have an impact on the IGCC Project through the ongoing review period of this proceeding. Joint Intervenors reiterated their prior testimony considered in previous IGCC dockets that these delays have been caused by mismanagement of the IGCC

10

Project.

Joint Intervenors renewed their previous concerns related to the "cascade effect" of construction problems and the impact of the "deep conflict" between GE [General Electric ("G.E."), Duke's primary equipment vendor for the Project,] and the Company and its impact on the IGCC Project. The Commission finds that these concerns of Joint Intervenors have been addressed in other proceedings and we are not persuaded that evidence presented herein alters those findings. Accordingly, they will not be addressed again in the present docket.

We further find that the Company has adequately satisfied the information reporting requirements to the Commission for purposes of these review proceedings as specified in the IGCC-1 and IGCC-2 Orders and subsequently amended in Cause No. 43114 IGCC-8. Accordingly, we approve the ongoing progress report for IGCC-9.

B. *Ratemaking Issues*. Joint Intervenors contend that Duke is not entitled to cost recovery in this proceeding and that Joint Intervenors believe CWIP [construction work in progress] is inappropriate. However, pursuant to Indiana Code ch. 8-1-8.8, and this Commission's Orders in previous IGCC proceedings, the Commission finds no basis to discontinue the recovery mechanism for the 1GCC Project it previously found appropriate within the statutory construct in Indiana.

Joint Intervenors assert that the Company's calculation of AFUDC is incorrect. Ms. Douglas explained that Petitioner calculated its AFUDC rates in conformance with FERC's general instructions for the computation of AFUDC rates (found in the Code of Federal Regulations), which this Commission has adopted for use by Indiana electric utilities, and that the Company's calculation does not include accumulated deferred income taxes because it is not one of the elements specified to be included in the calculation by FERC. She also explained that deferred income taxes are not included when calculating AFUDC rates in recognition of the fact that plant[,] which has not yet been placed in[ ]service[,] generally will not generate cumulative deferred income tax balances because it is not yet depreciating. We agree with Ms. Douglas that excluding deferred income taxes from the calculation of AFUDC rates is in accordance with the FERC instructions we have adopted for use by Indiana electric utilities and, therefore, is in accordance with this Commission's rules. We therefore find the Company's calculation of AFUDC rates to be applied to IGCC investment is correct.

11

Ms. Douglas testified as to the updated IGCC Rider and the associated calculations and assumptions contained in that Rider. Joint Intervenors did not present evidence of any miscalculations or propose any alternative calculations. The OUCC found the figures used in the calculation of the Rider to be supported by the exhibits of the Company. Based on our review of the evidence presented on this issue, we find that Duke's IGCC Rider, as sponsored by the testimony of Ms. Douglas, accurately reflects the net retail jurisdictional IGCC Project investment as of March 31, 2012, and that the proposed IGCC-9 Rider is accurately calculated and accurately incorporates the provisions of the Cause No. 43114 IGCC-4S1 Settlement Agreement. We find that the IGCC Project costs, including the actual IGCC Project investment incurred through March 31, 2012, up to the amount of the Hard Cost Cap and Additional AFUDC, as defined by the IGCC 4S1 Settlement Agreement and reflected in the testimony and exhibits of Ms. Douglas, are hereby approved consistent with our findings herein.

Ms. Douglas also sponsored Petitioner's Exhibit C-6 which shows the impact of the proposed IGCC Project ratemaking treatment. The monthly bill of a residential customer using 1,000 kilowatt-hours will decrease by $0.14 or approximately 0.2% with implementation of this factor.

*Appellants' App*. at 26-27.

On appeal, Intervenors contend that it was contrary to law for the Commission to pass IGCC-9 costs on to ratepayers without making findings regarding Intervenors' objections that Duke has negatively impacted customers' rates by being three months behind in construction and by prematurely declaring 50% of the Edwardsport Plant to be in-service.

The Indiana Code authorizes judicial review of Commission orders as follows:

Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in

12

other cases. *An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.*

Ind. Code § 8-1-3-1 (emphasis added).

Recently, our Supreme Court set forth the standard of review for the Commission order as follows:

The General Assembly created the Indiana Utility Regulatory Commission primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *N. Ind. Pub. Serv. Co. v. United States Steel Corp.,* 907 N.E.2d 1012, 1015 (Ind. 2009) [hereinafter *NIPSCO*]. The Indiana Code authorizes judicial review of IURC orders as follows:

> An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Ind. Code § 8-1-3-1 (2012). This amounts to a multiple tiered review. *NIPSCO* at 1016. First, *the order must contain specific findings on all the factual determinations material to its ultimate conclusions. Id.* We review the conclusions of ultimate facts, or mixed questions of fact and law, for their reasonableness, with greater deference to matters within the IURC's expertise and jurisdiction. *Id.* (citing *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314, 1317-18 (Ind. 1998)). Second, the *findings of fact must be supported by substantial evidence in the recor*d. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses and consider only the evidence most favorable to the IURC's findings. *Id.* (quoting *McClain,* 693 N.E.2d at 1317). Finally, we review whether IURC action is contrary to law, "but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *Id.*

*Ind. Gas Co., Inc. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 65-66 (Ind. 2013) (emphasis added).

13

The parties disagree regarding the extent to which the findings must be set forth in the Commission's order. Intervenors contend, "By simply ignoring the central dispute in the case, the Commission failed to satisfy its duty 'to articulate the policy and evidentiary factors underlying its resolution of all issues which are put in dispute by the parties." *Appellants' Br.* at 13 (quoting *L.S. Ayres & Co. v. Indianapolis Power & Light Co.*, 169 Ind. App. 652, 676, 351 N.E.2d 814, 830 (Ind. Ct. App. 1976)). Duke maintains that the Commission is not required to resolve all issues that are put in dispute by the parties, but instead, the Commission's order must contain specific findings on all factual determinations material to its ultimate conclusions. *Appellee's Br.* at 9-10 (quoting *L.S. Ayres*, 169 Ind. App. at 661, 351 N.E.2d at 822). We find the Commission's order was deficient under both standards and that the Commission failed to articulate the policy and evidentiary factors underlying the issues put in dispute by Intervenors. As we explain below, the Commission also failed to make adequate findings on all factual determinations *material to its ultimate conclusions* to allow Duke to pass along to ratepayers all of Duke's IGCC-9 costs.

## I.     Three-Month Delay and Financial Impact

As part of the IGCC-9 review, Duke requested Commission approval to change the IGCC Rider to recover financing costs incurred from October 1, 2011 through March 31, 2012. Intervenors insist that the Commission's order, which lacked specific findings on the three-month delay, is contrary to law. Specifically, Intervenors contend that the Commission was required to make findings regarding whether Duke was entitled to the full recovery of its requested financing costs in light of the fact that, during the period under

14

review, there was a three-month delay in Project testing and a commensurate $61 million cost associated with that delay.

We agree with Intervenors that the findings were insufficient to support the Commission's conclusion that Duke was entitled to recover through the IGCC Rider the $61 million in financing charges incurred during the three-month delay in commissioning the Plant. The first paragraph of the section titled "*Ongoing Review Progress Report for IGCC-9*," is merely the Commission's reiteration of Womack's and Intervenors' testimony regarding the delay—Womack testified that the delays were caused by the increase in bulk commodity quantities, while Intervenors testified that the delays were caused by Duke's mismanagement of the Project. This paragraph contains no findings. In the second paragraph of that section, the Commission states that Intervenors renewed their previous concerns relating to the "cascade effect" of construction problems and the impact of the "deep conflict" between G.E. and the Company and its impact on the IGCC Project. Again, this language does not reflect a Commission finding. The only true finding is as follows: "The Commission finds that these concerns of Joint Intervenors have been addressed in other proceedings and we are not persuaded that evidence presented herein alters those findings. Accordingly, they will not be addressed again in the present docket." *Appellant's App.* at 26. As we discuss below, the evidence before the Commission did not support this finding.

Although the IGCC Project is ongoing, each of the IGCC reviews covers a distinct six-month period.[9] During the IGCC-9 review, Intervenors focused specifically on a three-month delay that occurred during the period from October 1, 2011 through March 31, 2012. In written testimony, Womack confirmed that, in 2010, Duke set a schedule forecasting that the Edwardsport Plant would be in-service by September of 2012 and would reach "substantial completion" in December of 2012. *Appellants' App.* at 59. In November 2011, one month into the IGCC-9 review period, the in-service date was still projected to be September 2012. *Tr.* at 23-24. However, over the course of the six-month IGCC-9 test period, the Project schedule fell behind by three months. This delay was supported by Womack's testimony that within one month of the conclusion of the IGCC-9 test period, the projected in-service date was postponed until December 2012 and the "substantial completion date" was postponed until March 2013. *Id.* at 25-26.

Intervenors' counsel J. David Agnew, recognizing that various delays had plagued the Project, reminded Womack that during the IGCC 4-S1 hearings, Womack had testified regarding Project delays and cost overruns pertaining to "unexpected quantity increases in the Fall of 2009." *Id.* at 18. To distinguish the current delay, Agnew asked Womack whether the three-month[10] delay under this IGCC-9 review was a function of those same

---

[9] Duke also recognizes the distinct nature of these proceedings as reflected by the following comment it made in its February 2013 reply to Intervenors' objections: "[T]he principles of collateral estoppel or issue preclusion do not apply to this proceeding, which covers an entirely different time period than that reviewed by the Commission in IGCC-4S1." *Appellant's App.* at 467.

[10] During the hearing, Agnew referred to a six-month delay. Noting that by October 31, 2012, the IGCC Project was delayed an additional three months, Agnew discussed both of these delays together. The delay at issue, however, is the three-month delay that occurred during the six month review in question, which ended March 31, 2012.

16

quantity increases. *Id.* at 19. Womack responded, "[T]here may have been some residual impact from the quantity increases"; however, quantity increases "was not the primary reason for the delay." *Id.* at 19-20. Womack conceded that the reasons for the three-month delay "were different—primarily different than the quantity increases." *Id.* Upon further questioning, Womack admitted that "primarily, the quantity increases impacted the construction period most and then a slight increase on the start-up period," the latter of which was the period at issue. *Id.* at 21-22.

Intervenors also introduced evidence that Duke was responsible for the delay because the testing problems, and therefore the delay, fell within Duke's area of responsibility. To support this position, Intervenors introduced, without objection,[11] monthly Progress Reports that G.E. had prepared during the IGCC-9 period. *Id.* at 156-57. In these Progress Reports, G.E. "blamed the quality—or lack thereof—of Duke's 'commissioning' activities for these equipment problems and resulting delay." *Appellants' Br.* at 7. Contrary to the Commission's statement, the Intervenors' concern of the three-month delay during IGCC-9 was not "addressed in other proceedings." *Appellant's App.* at 26.

As to the financial impact, Intervenors cite to Douglas's testimony establishing the financing costs during the IGCC-9 period. During the Commission hearing, Douglas quantified the revenue requirement for financing costs (when grossed up for taxes) as

---

[11] After being specifically asked if she had any objections to these reports being introduced into evidence, Duke's attorney replied that she did not object. *Tr.* at 156.

roughly $122 million. *Tr.* at 145-46, 150. Douglas confirmed that to get the per month financing charge, the $122 million would be divided by six, which would result in roughly $61 million for three months of financing costs. *Id.* at 150.

Intervenors point to the January 2013 testimony of Douglas, who testified that financing costs related to Duke's construction work in progress ("CWIP"), *i.e.*, financing costs recovered through the IGCC Rider (plus an additional "gross up" to factor in the cost of taxes) amounted to $20.38 million per month, or roughly $61 million for three months. *Id.* at 145-51

Duke counters that the Commission properly declined to rely on the G.E. Progress Reports to reach its determination because those Reports were "plainly hearsay to the extent introduced for the truth of the matter asserted." *Appellees' Br.* at 12. Furthermore, even if Intervenors proved imprudent delay, Duke alleges that no evidence was introduced during the hearing to quantify the costs of that delay. Duke insists that Douglas did not equate $61 million with the delay in the scheduled in-service date, "nor did she calculate or quantify the potential impact of any alleged schedule delay on the IGCC-9 rates." *Appellant's App.* at 477. Duke finds that Intervenors' claim on appeal that this was the "central dispute in the case" is a fallacy. *Appellees' Br.* at 14 (citing *Appellants' Br.* at 13).

In its final order, the Commission approved 100% of Duke's requested financing costs for the IGCC-9 review period. Intervenors contend, and even Duke agreed, "The Commission did not specifically address Joint Intervenors' contention that the purported delay led to financing charges of $61 million." *Appellants' Reply Br.* at 7 (citing *Appellees' Br.* as 16). Intervenors maintain that Duke cannot cure this defect by arguing that "there

18

was 'sufficient evidence' on which the Commission *could have relied* in entering its order." *Id*. at 8 (emphasis in original). If the Commission agreed with Duke, and disagreed with Intervenors, regarding the impact of the delay on rates, Intervenors argue that the Commission should have made findings to support its determination.[12] *Id*.

We need not find that the three-month delay was the "central dispute" to conclude that Commission findings relating to the delay and its impact on ratepayers were "material to [the Commission's] ultimate conclusions." *L.S. Ayres*, 169 Ind. App. at 661, 351 N.E.2d at 822. We remand this issue to the Commission for findings as to whether the three-month delay was chargeable to Duke, and if so, what impact that delay had on Duke's customers' rates.

**In-Service Date**

Intervenors also argue that it was contrary to law for the Commission to make no findings regarding Duke's request that 50% of the Plant be declared in-service as of August 12, 2012, where Duke admitted that the plant had not reached its "In-Service Operational Date" as that term was defined in a Commission-approved settlement agreement to which Duke was a party, and the resolution of this issue impacted Duke's customers' rates. Intervenors' contention arises in the following context.

---

[12] Duke claims that it "provided extensive testimony" to rebut Intervenors' contention that Duke caused the delay. *Appellees' Br.* at 5. First, Duke's witnesses testified that "delays occur as part of every construction project, especially a large one such as this, and were not caused by mismanagement." *Id*. (citing *Tr*. at 309-10). Second, Womack testified, "the required schedule extension[s] have been driven by the circumstances of the Project, caused largely by circumstances outside the Company's control" and "are certainly not the result of Duke Energy mismanagement." *Id*. (citing *Tr*. at 310). Duke reminded this court that the G.E. Progress Reports cannot be trusted because they were prepared in anticipation of commercial litigation, i.e., a suit by Duke against G.E. *Id*. Because Duke made these rebuttals, the Commission should have made findings regarding the impact of the delay and resulting financing costs.

19

In her written testimony, Douglas explained the financing, depreciation, and other costs that Duke proposed to immediately pass through to ratepayers by means of the IGCC Rider. In her corrected testimony, filed four months later, Douglas added the following three sentences:

> [Duke] has determined that approximately half of the Edwardsport IGCC plant (consisting primarily of the power block, including the gas CTs, HRSGs, and steam turbine*) should be declared to be in-service as of August 1, 2012, for income tax purposes*, which will produce bonus depreciation in 2012 sufficient to prevent the use of the Section 199 deduction in 2012. The remainder of the plant is expected to be declared in-service for income tax purposes in 2013. [Duke's] external auditors will be reviewing the income tax in-service decision at year-end.

*Appellants' App.* at 265-66 (emphasis added). Douglas offered no explanation regarding how Duke's declaration of 50% in-service as of August 1, 2012, was consistent with the Agreement's definition that September 24, 2012 was the earliest that the Plant could be deemed in-service. On cross-examination Douglas claimed that the Agreement was not violated because its language was meant to limit Duke's ability to declare the plant in-service for *ratemaking and accounting purposes,* but not *for tax purposes.*[13] *Tr.* at 127-29.

The Commission, however, had conflicting evidence on this issue from Douglas herself where, in her written rebuttal, Douglas admitted that the in-service declaration would not only affect Duke's taxes, *it would also have an accounting and ratemaking effect in IGCC-9*, saying, "Mr. Olson is not correct, however, that this determination does not

---

[13] However, Douglas admitted that the Agreement's definition relating to in-service makes no distinction between in-service for ratemaking purposes and in-service for tax purposes. *Appellants' App.* at 209. It is a well-established principle of Indiana law that any ambiguities in a contract are to be strictly construed against the drafter. *Heartland Crossing Found., Inc. v. Dotlich*, 976 N.E.2d 760, 763 (Ind. Ct. App. 2012). Duke, as a signatory to that Agreement, had a measure of control over the terms, and Intervenors opposed the Agreement and therefore did not draft any of its terms.

20

affect the accounting or the rates the Company is proposing in IGCC-9." *Appellants' App.* at 405. When asked at the hearing to explain the impact this partial in-service declaration would have on customer rates in IGCC-9, Douglas explained: "They were higher - the rates were higher than they would have been had we been able to utilize the Section 199 deduction." *Tr.* at 120. Intervenors' attorney asked, "So am I correct that the declaration of in-service does cause rates to be higher than they otherwise would be," Douglas responded, "Yes, in this particular proceeding." *Id.* at 122. In other words, by declaring the Plant partially in-service, Duke has caused retail rates to rise.

Intervenors highlight that Douglas did not disclose until the hearing in January 2013, that declaring the Plant partially in-service would increase retail rates. *Id.* For that reason, Intervenors, assuming that the partial in-service would not impact rates or accounting, initially took no position on this issue. *Appellants' App.* at 350.

Douglas's belated revelation that customer rates within the IGCC-9 period would increase as a result of Duke's decision to declare the Plant partially in-service, placed Intervenors at a distinct disadvantage. First, the soonest Intervenors could object to this change in in-service date was in their exceptions to Duke's proposed order. Second, Intervenors were unable to conduct discovery to determine the long-term rate implications of this premature in-service declaration. Accordingly, because of the lateness of Douglas's revelation, Intervenors recommended that any increase to Duke's IGCC Rider rates attributable to the in-service declaration should be approved by the Commission only on an "interim" basis, i.e., subject to possible refund after the long-term ratemaking implications could be evaluated. *Appellants' App.* at 438. The Commission neither

21

accepted nor rejected this recommendation. Instead, the Commission simply ignored the in-service issue entirely. In its final order, the Commission made no reference to Douglas's testimony on cross examination, nor to the fact that Intervenors had changed their position in response to Duke's change in position. Instead, the Order simply summarized Intervenors' initial position - i.e., taking no position, so long as customer rates would not be impacted - without ever addressing the evidence admitted at the hearing or Intervenors' post-hearing arguments based on that evidence.

Here, the Commission reached *no conclusion* and made *no findings* on whether or how the Plant could be declared 50% in-service for ratemaking purposes. "The subject matter of the regulatory process is too complex to permit the judicial non-expert any clear insight concerning the legal and factual issues which the Commission thought 'material' to its decision." *L.S. Ayres,* 169 Ind. App. at 676, 351 N.E.2d at 830. The declaration of in-service was pertinent to the ratemaking treatment of Duke's request under IGCC-9. Neither during the formal hearings nor in the Commission's final written order was any attempt made to articulate the reasons underlying the Commission's apparent acceptance of Duke's request that the 50% of the Plant be deemed to be in-service. "Since the record is clearly insufficient to disclose the factors considered, we are incapable of determining that the considerations which actually motivated the Commission's decision were reasonably related to the discharge of its statutory duty." *L.S. Ayres*, 169 Ind. App. at 677, 351 N.E.2d at 830. We must remand this portion of the proceedings to the Commission for a clear statement of the policy and evidentiary considerations underlying its determination regarding Duke's request that 50% of the Plant be deemed to be in-service.

We remand to the Commission for actions consistent with this opinion.

Remanded for additional findings.

BAILEY, J., and MAY, J., concur.